IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Criminal Action No. 06-73-GMS |
| | ) | |
| DION L. BARNARD, | ) | |
| Defendant. | ) | |

## GOVERNMENT'S MEMORANDUM IN OPPOSITION TO DEFENDANT'S MOTION TO SUPPRESS EVIDENCE AND STATEMENTS

**COMES NOW** the United States of America, by and through Colm F. Connolly, United States Attorney for the District of Delaware, and Shannon Thee Hanson, Assistant United States Attorney for the District of Delaware, and files this opposition to defendant Dion Barnard ("Barnard"'s) Motion to Suppress Evidence and Statements.

Respectfully submitted,

COLM F. CONNOLLY
UNITED STATES ATTORNEY

By: _____
Shannon T. Hanson
Assistant United States Attorney
1007 N. Orange Street, Suite 700
P.O. Box 2046
Wilmington, DE 19899-2046
(302) 573-6277

Attorneys for the United States

Dated: October 29, 2007

## I.   PROPOSED FINDINGS OF FACT

On June 27, 2006, defendant Dion Barnard was charged by the grand jury for the District

of Delaware with distribution of over fifty grams of cocaine base, in violation of 21 U.S.C.

Section 841(a)(1) & (b)(1)(A).  Docket Items ("D.I.") 12 & 13.  The charge stems from a January

12, 2006, meeting which resulted in the distribution of cocaine base from Barnard to a

Confidential Informant ("CI") and was observed by Drug Enforcement Administration ("DEA")

Special Agents and Taskforce Officers.  Transcript of September 17, 2007 Suppression Hearing

(hereinafter "9/17/07 Tr.") at 31.

On April 28, 2006, a criminal complaint and accompanying federal arrest warrant against

Barnard was authorized by United States Magistrate Judge Mary Pat Thynge.  9/17/07 Tr. at 20-

21, 31; DX-1.[1]  On June 14, 2006 at approximately 3:00 p.m., the defendant, then a Level 3

probationer with the State of Delaware, was arrested when he reported to his Probation & Parole

("P&P") Senior Probation Officer Angela Latsko ("Latsko").  9/17/07 Tr. at 7-9.[2]

Officer Latsko detained Barnard on the federal arrest warrant stemming from Barnard's

January 12, 2006 cocaine base distribution.  *Id.* at 19-20.  Upon Barnard's arrest he was placed in

handcuffs.  *Id.* at 22.  Latsko then telephoned DEA Taskforce Officer ("TFO") Lawrence Collins

---

[1]  At the time of the January 12, 2006 distribution, the CI knew defendant Barnard only as "Ross."  It took several months for DEA officers to determine the defendant's true name and identity.  9/17/07 Tr. at 31-32, 44-45.

[2]  The delay between the date Barnard's criminal complaint was signed and the date of his arrest was due, in part, to the continued utilization of the CI in other matters as well as the need to reassign Barnard's case after the taskforce officer responsible for it left DEA.  9/17/07 Tr. at 62.

to inform him that Barnard was in custody.[3] *Id.* at 9-10, 33.  Thereafter, TFO Collins, TFO

Michael Santos, and DEA Special Agent Eric Miller drove to P&P's New Castle office. *Id.* at

32-33, 62-63. Once there, they entered Latsko's office --where Latsko, P&P Officer Eric

Fentress, and Barnard were present-- and took Barnard into federal custody. *Id.* at 10, 33, 63.

### A.  Consent to Search #1 - Dion Barnard

Prior to Barnard's arrest on the federal warrant, Latsko sought and obtained permission

from her supervisor, Carlo Pini, to perform an administrative search at the home address Barnard

had provided to P&P, 431 Howell Drive, Collins Park, New Castle, DE. 9/17/07 Tr. at 12-13, 18;

Transcript of July 19, 2007 Suppression Hearing (hereinafter "7/19/07 Tr.") at 11-13.[4]  Latsko

informed Barnard, in the federal officers' presence, that P&P officers were going to search his

residence. 9/17/07 Tr. at 63.  This was also when the federal officers first learned that P&P was

going to search Barnard's home. *Id.* at 34, 46.

---

[3] TFO Collins is employed by the State of Delaware, Department of Corrections, Division of Probation and Parole, as a parole officer, although he had been a DEA taskforce officer for approximately nine years as of Barnard's arrest. 9/17/07 Tr. at 30.  Prior to June 14, 2006, TFO Collins informed Officer Latsko that there was an outstanding federal warrant for Barnard. *Id.* at 9, 21-22, 45.

[4] According to Latsko, the rationale underlying P&P's reasonable suspicion to search probationer Barnard's residence included the fact that Barnard had an outstanding federal arrest warrant for distribution of cocaine and that the distribution in question had been videotaped. 9/17/07 Tr. at 11.  Pini testified that, prior to the search, Latsko requested oral permission to search 431 Howell Drive, informing Pini that Barnard had a federal arrest warrant for a trafficking weight amount of cocaine, he had a criminal history of involvement with drugs, and the facts supporting the criminal complaint were corroborated through the CI and P&P. 7/19/07 Tr. at 12-15, 18.  On the basis of this information as reasonable suspicion to engage in a probation search for contraband, Pini verbally granted Latsko's request to search 431 Howell Drive. *Id.* at 14-15, 19.  That verbal authorization was followed up the following day with Pini's electronic signature on a pre-search checklist completed by Latsko. 7/19/07 Tr. at 17-18; 9/17/07 Tr. at 17-18.

3

At that point, Agent Miller identified himself as a DEA agent and introduced TFOs Collins and Santos. Miller then asked Barnard if he, Collins, and Santos (DEA) could search Barnard's room at 431 Howell Drive in connection with the April 28, 2006 criminal complaint. *Id.* at 35, 63-64. Barnard gave his consent for this search of his room. *Id.* at 35, 47, 64. Miller testified that he did not explain what DEA wished to search for in Barnard's room, nor did he place any parameters on the scope of the search. *Id.* at 64. Miller's request for consent to search Barnard's room was not limited to drugs and/or drug paraphernalia. *Id.* at 59-60, 77. TFO Collins believed P&P search extended to "any contraband or anything that would violate [Barnard's] probation further." *Id.* at 54.

### B. Barnard Informed Of And Waived *Miranda* Rights

Barnard was then taken, in handcuffs, by Agent Miller and TFO Collins out of Latsko's office and down the hallway to be transported from P&P's New Castle office in TFO Collins's car. *Id.* at 36, 65. During the walk to the car, Miller read Barnard his *Miranda* warnings pursuant to the text on his DEA-13A card. *Id.* at 65-66. Barnard acknowledged his rights and, upon being asked if he was willing to answer any questions, stated, "Who set me up?" *Id.* at 36, 65. None of the officers present responded to Barnard's question, but they noted his initial confusion about the conduct underlying the arrest as evidenced by the question. *Id.* at 65, 67-68. All communications between Barnard and Miller were in the English language, which Barnard seemed to have no trouble understanding. *Id.* at 36, 66. Likewise, Barnard did not appear to the officers to be under the influence of drugs, alcohol, or any mental or physical disability. *Id.* at 36, 66. No promises or threats about his federal charges were made to Barnard. *Id.* at 36-37, 66.

The federal officers transported Barnard by car to 431 Howell Drive, following P&P

4

officers who also were headed there to conduct their search. *Id.* at 36, 40, 67. Collins drove the car and Miller occupied the front passenger seat; Santos and Barnard were in the back. *Id.* at 37, 67. The officers spoke with Barnard both during the approximately fifteen minute car ride from P&P's New Castle office to Barnard's residence and while parked outside of 431 Howell Drive. *Id.* at 38, 69. Miller testified that Barnard's demeanor was calm and cooperative; Collins likewise described him as cooperative. *Id.* at 38, 67. Once they got to 431 Howell Drive, Barnard remained in the car with one or more officers. He was not taken inside the house. *Id.* at 40, 42.

In Collins's car, Barnard was questioned about the January 12, 2006, drug distribution that was the subject of the federal criminal complaint, which he did not recall. *Id.* at 37, 68. Barnard also was questioned about the disappearance of woman, Reesha Lewis. *Id.* at 38, 49-50. No threats, promises, or untruthful statements were made to Barnard during questioning, nor did Barnard ask for anything from the agent or taskforce officers. *Id.* at 39, 68-69.

### C. Consent To Search #2 - Dorinda Richardson

P&P officers, along with Agent Miller, were met at the door to 431 Howell Drive by the homeowner, Dorinda Richardson, whom Latsko believed was Barnard's cousin. *Id.* at 14, 28-29, 39-40, 69. Richardson was informed of the nature of the search, and she consented to it. *Id.* at 14, 29, 70 ("One of the members of Parole & Probation . . . explained why they were there, and asked if it was okay to search. And [Richardson] said, yes, and allowed them in."). Richardson further explained where Barnard's bedroom was and directed the officers to it. *Id.* at 26-27, 29.

### D. Consent to Search #3 - Dion Barnard

Agent Miller went inside with the P&P officers, went into Barnard's bedroom, and

looked around the room. *Id.* at 48, 70. Miller testified that Barnard's bedroom was very small and "two or three" P&P officers were already in the room searching, so he left the room. *Id.* at 73.[5] Miller then returned to Collins's car. *Id.* at 41, 70. Miller testified that it is his procedure, after an individual has given verbal consent to search, to follow up with their signature on a consent to search form. *Id.* at 70-71. Miller could not find a standard DEA consent to search form in the trunk of Collins's car, so he wrote out a consent in long-hand (on a DEA-12 form he had retrieved from the trunk) and showed it to Barnard. *Id.* at 41, 70-71. Barnard again indicated "it was okay to search his room," but that he would not sign anything. *Id.* at 41, 52, 71. Miller testified that he threw out the handwritten consent form that Barnard did not sign. *Id.* at 71. Thereafter, Miller returned to Barnard's bedroom within 431 Howell Drive to check on the progress of the search, and then went back again to Collins's car. *Id.* at 71.

### E. Consent To Search #4 - Dion Barnard

At some point, TFO Collins also left the car and went into the house. *Id.* at 23, 40, 55. Collins testified that he went into 431 Howell Drive "because Mr. Barnard asked me to go in and look for his work schedule that he thought was by the television." *Id.* at 55, 57-58.[6] No drugs were found at the residence. *Id.* at 14-15. However, several items of evidentiary value were found during the search, including approximately $2,300 in cash, letters to Mr. Barnard and in

---

[5] Latsko recalled that P&P Officers Fentress and Theresa Carruthers searched Barnard's room, after being directed to it by Richardson. *Id.* at 26.

[6] Prior to Collins's entry into 431 Howell Drive, he and Barnard were discussing the events of January 12, 2006. Barnard told Collins that he was working on January 12, 2006, and claimed that he therefore could not have been present at the site of the cocaine base distribution. *Id.* at 37, 58. Accordingly, Barnard's request that Collins go into Barnard's bedroom was related to Barnard's statements that he could not have been present during the January 12, 2006 cocaine base sale. *Id.* at 58.

the name of Ross Cephas/Ross Money, photographs of the missing woman, keys, and a car title. *Id.* at 14, 41. The letters/paperwork in the name of Ross Cephas/Ross Money found in Barnard's bedroom were seen by Collins as having evidentiary value because "Ross" was the name by which the CI knew the defendant at the time of the cocaine base distribution in January 2006. *Id.* at 42, 54. The letters were not seized initially at Collins's request, but, when Collins expressed interested in them, he took possession of these letters/paperwork while within Barnard's bedroom. *Id.* at 54-55. Indeed, all the items seized by P&P officers were given to TFO Collins. *Id.* at 16, 53, 56.

## II.    PROPOSED CONCLUSIONS OF LAW

### A. Summary of Argument

The June 14, 2006, search of Barnard's residence at 431 Howell Drive was conducted without a warrant. Accordingly, to comply with the Fourth Amendment, that search must fall within one or more recognized exceptions to the warrant requirement. Those exceptions include searches conducted pursuant to the defendant's consent. *See Schneckloth v. Bustamonte*, 412 U.S. 218, 219 (1973); *Florida v. Jimeno,* 500 U.S. 248, 250-51 ("the Fourth Amendment does not proscribe all state-initiated searches and seizures; it merely proscribes those which are unreasonable. . . . Thus, we have long approved consensual searches because it is no doubt reasonable for the police to conduct a search once they have been permitted to do so.")(internal citations omitted).

Here, both Barnard and the homeowner, Dorinda Richardson, consented to search of the house. 9/17/07 Tr. at 14, 29, 35, 47, 64, 70. Indeed, Barnard expressed his consent to a law enforcement search of his room at 431 Howell Drive on three occasions over the course of the

7

afternoon of June 14, 2006. *Id.* at 35, 41, 47, 52, 55, 57-58, 64, 71. Accordingly, the evidence found during that search should not be suppressed. *See Schneckloth,* 412 U.S. at 219. Even assuming *arguendo* that the documents/letters seized from the defendant's bedroom were taken during the course of an invalid search, they nevertheless should be admissible at trial under the inevitable discovery doctrine. Even if the documents initially were found by P&P officers, TFO Collins, lawfully following Barnard's invitation to search the home for the defendant's work schedule, would have found them. 9/17/07 Tr. at 55, 57-58. Defendant's motion to suppress the evidence seized during the June 14, 2006 search of 431 Howell Drive fails.

Likewise, the defendant's motion to suppress his post-arrest statements should be denied. Under the totality of the circumstances, the defendant's statements were taken in compliance with *Miranda v. Arizona,* and/or were voluntarily made and thus do not require *Miranda* warnings. *See* 9/17/07 Tr. at 36, 65-66. Of particular note under the facts of the case at bar, *Miranda* warnings were not required prior to the defendant's statement of consent to search. Thus, the defendant's motion to suppress statements likewise should be denied *in toto.*

**B. Argument**

The defendant, a probationer, was arrested pursuant to a federal arrest warrant at P&P's New Castle office when he reported to his probation officer. 9/17/07 Tr. at 7-9. After custody of the defendant was transferred from P&P to the DEA, P&P Officer Latsko informed Barnard, the DEA agent and taskforce officers present that P&P would be conducting an administrative search of 431 Howell Drive, the address Barnard had reported to P&P as his residence for at least the prior month. *Id.* at 27-28. At this time, DEA Agent Miller introduced himself and the DEA TFOs Collins and Santos, and identified themselves as being with the DEA. Agent Miller asked

8

if the defendant would permit the DEA to search his room at the house. *Id.* at 35, 63-64. The

defendant consented to the search. *Id.* at 35, 47, & 64 ("I asked Mr. Barnard if we, meaning

myself, DEA Agent (sic) Larry Collins and Santos, could search his room. And he said yes.").

The government maintains that Barnard's initial consent to search made the subsequent joint

entry and search of 431 Howell Drive by all subsequent law enforcement personnel – probation

officers and the DEA – lawful. *Cf. United States v. Mendez,* 431 F.3d 420, 426-27 (5th Cir.

2005)(homeowner's consent given to immigration agent to enter home to look for suspected

illegal aliens reasonably extended to six/seven other law enforcement agents present at scene;

agent to whom homeowner gave consent explained objective before entering house, and

homeowner did not attempt to limit the scope of his consent, nor objected to additional agents

entering his house).

P&P officers were present at 431 Howell Drive to perform a search of probationer

Barnard's residence pursuant to their administrative authority. 7/19/07 Tr. at 14-15, 19; 9/17/07

Tr. at 12-13, 18. The government maintains this administrative search was supported by

reasonable suspicion and therefore was valid. *See, e.g., United States v. Knights,* 534 U.S. 112,

119, 121 (2001)(balance of extent of intrusion on defendant's privacy versus need to advance

proper governmental interests requires "no more than reasonable suspicion" to conduct a search

of probationer's house); *United States v. Williams,* 417 F.3d 373, 376 (3d Cir. 2005)(reasonable

suspicion shown when, under totality of circumstances, probation officer possesses "'a

particularized and objective basis for suspecting legal wrongdoing'")(*quoting United States v.

Arvizu*, 534 U.S. 266, 273 (2002)).

In this instance, however, the government is not relying upon the validity of the

administrative search to support the search and seizure of items, including letters, from Barnard's room.  Rather, the government rests its argument as to the validity of the search and seizure of items from 431 Howell Drive upon three doctrines: (1) defendant Barnard's repeated consents to that search – consents that the suppression hearing record well demonstrates; (2) the independent consent to search provided by homeowner, Dorinda Richardson; and (3) the doctrine of "inevitable discovery."[7]

### 1. Barnard Consented To The Search While At the Probation Office and Twice Reaffirmed That Consent; Accordingly The Subsequent Search and Seizure of Items From His Room Within 431 Howell Drive Was Legal.

#### a. Standard of Review.

The government bears the burden to demonstrate that Barnard's consent to the June 14, 2006 search of his room at 431 Howell Drive was voluntary.  This Court's factual determination, based on the totality of the circumstances, about the voluntariness of Barnard's consent will be reviewed under a clearly erroneous standard.  *See, e.g., United States v. Givan*, 320 F.3d 452, 459-60 (3d Cir. 2003).

#### b. The Totality Of The Circumstances Support The Voluntariness of Barnard's Initial Consent to Search.

Under the totality of the circumstances, Barnard's consent to the search was voluntary.  *Id.*  Factors the Third Circuit has held to be critical in this review include "the setting in which

---

[7]  Apparently conceding the lawfulness of the officers' search of 431 Howell Drive, the defendant's brief focuses the "plain view" doctrine and, specifically, upon the fact that the "incriminating nature" of the items "in plain view" which were seized from the defendant's residence was not "immediately apparent."  *See* Defendant's Brief in Support of Defendant's Motion to Suppress Evidence and Statements ("Def.'s Br. in Support") at "Conclusions of Law" ¶¶1-3 and "Argument," pg. 1.  The government rejects "plain view" as the controlling legal theory in this case; rather, the government's analysis of this case turns on the doctrines of consent searches and inevitable discovery, as set forth below.

the consent was obtained, the parties' verbal and non-verbal actions, and the age, intelligence, and educational background of the consenting individual." *Id.* at 459 (*citing United States ex rel. Harris v. Hendricks*, 423 F.2d 1096, 1099 (3d Cir.1970)). No single factor is dispositive in determining the voluntariness of a defendant's consent. *Schneckloth*, 412 U.S. at 226-227. Indeed, courts frequently find consent to be voluntary under the totality of the circumstances where the defendant has not been informed by the police of his right to refuse such consent. *See, e.g., United States v. Drayton*, 536 U.S. 194, 207 (2002).

The defendant here is an individual with prior experience with the criminal justice system (he was on Level 3 probation with the state at the time of his arrest - 9/17/07 Tr. at 7), who did not appear to have difficulty speaking or understanding the English language, to be under the influence of any substances, or to suffer from any mental or physical disability. *Id.* at 36-37, 66. While the defendant was handcuffed at the time he consented to the search, *id.* at 22, the circumstances of his arrest were not unduly coercive. Upon his arrest, Barnard was seated in a chair within Officer Latsko's office at P&P's New Castle site during the middle of the afternoon. *Id.* at 8-9, 33-34.

Barnard's demeanor was described by Agent Miller as "calm and cooperative" and by TFO Collins as "cooperative." *Id.* at 38, 67. (Any confusion by the defendant appeared to stem from his attempt to determine the facts underlying the charge. *Id.* at 65, 67-68.) At the time of his consent, Barnard had been detained for only a short time, the DEA having been informed of his arrest and traveling to P&P's New Castle office shortly thereafter. *Id.* at 10, 32-33, 62-63. There is not even a suggestion of any physical force or coercive behavior being used against Barnard; rather, the record indicates that the agents/taskforce officers made no promises or

11

threats to the defendant about his federal charges --prior to Barnard's consent to search or at anytime that afternoon-- and they were truthful in their dealings with him. *Id.* at 36-37, 39, 66, 68-69.

It is in this atmosphere that Barnard heard Miller identify himself and the other federal officers present as a result of the federal arrest warrant, and that Barnard agreed to their search of his room at 431 Howell Drive. *Id.* at 35, 47, 64. ("I identified myself as a DEA agent and introduced Task Force Officer Collins and Santos to Mr. Barnard. I then asked for consent to search his room at that residence. I did not set any parameters. I did not explain to Mr. Barnard what I wished to search for. I just asked for and was given consent to search only that room at the residence. . . . I asked Mr. Barnard if we, meaning myself, DEA Agent (sic) Larry Collins and Santos, could search his room. And he said yes.")

Both Agent Miller and TFO Collins subsequently entered Barnard's room at 431 Howell Drive, and both generally observed --in Fourth Amendment parlance, searched-- its contents. The fact that they did not look through drawers and physically retrieve the seized objects themselves, but rather let the probation officers (who were likewise lawfully present in the house) do so in no way negates Barnard's consent to their search of his room.[8]

### c. Defendant Barnard Twice Reaffirmed His Consent To Search.

A key factor for this Court to consider in assessing the voluntariness of Barnard's consent to search his room is the fact that the defendant twice reaffirmed that consent while in TFO

---

[8] Miller testified that Barnard's bedroom was very small and "two or three" P&P officers were already in the room searching, so he left the room. *Id.* at 73. Miller's statement, *id.* at 70, that he "did not search" the house is contradicted later by his statement that he was present and looking in Barnard's room and in that way executed the search for which he sought consent. *Id.* at 73. *See also* discussion of the inevitable discovery doctrine, *infra*.

Collins's car outside 431 Howell Drive.  At some point after Agent Miller initially entered the

house and looked in Barnard's bedroom, he returned to the car and asked Barnard if he would

sign a handwritten consent to search form.  9/17/07 Tr. at 41, 70-71.  While Barnard would not

sign the form, he reiterated that "it was okay to search his room." *Id.* at 41, 52, 70-71.[9]  Here,

Barnard's words belie any attempt to argue that the defendant's refusal to sign the form offered

by Miller was somehow a "withdrawal" of his earlier consent.  Instead, Barnard specifically

reaffirmed his consent to search, noting merely that he was not "signing anything." *Id.* at 41, 71.

 Even more tellingly, at some point during his time in the car outside 431 Howell Drive,

in the context of a discussion about the events of January 12, 2006, Barnard actually *invited* TFO

Collins to search his room for paperwork, specifically an employment work schedule and/or pay

stub. *Id.* at 57.  It was Collins's opinion that Barnard wanted this information to demonstrate that

he could not have been at the site of the January 12, 2006, cocaine distribution because he was

working. *Id.* at 58.  Pursuant to Barnard's third consent/request that Collins engage in a search,

Collins went inside 431 Howell Drive. *Id.* at 55, 57-58. Collins did not find any pay stubs or

work schedule information in Barnard's room. *Id.* at 58.

### d. Defendant's Consent Extended To A Search For Any Object of <u>Evidentiary Value In His Room.</u>

 The scope of a consent search may not exceed the scope of the consent given, which is

generally defined by the expressed object of the search. *See, e.g., Jimeno*, 500 U.S. at 250

(object of search defines its scope unless one granting consent expressly limits that scope).  The

---

[9] While courts can consider a defendant's refusal when asked to sign a consent form, that refusal does not negate an earlier – or later – consent, nor does it preclude a finding that consent was voluntarily given. *See generally United States v. Rivas*, 99 F.3d 170, 176 (5th Cir. 1996).

scope of a defendant's consent is determined under an objective reasonableness standard, by assessing how the "typical reasonable person" would have understood the conversation between the officer (here Agent Miller) and the defendant (Barnard) at the time consent was given. *Jimeno*, 500 U.S. at 250-51.

Here, the scope of Barnard's initial consent to search his room, given to Agent Miller, was all-inclusive. Agent Miller did not explain what DEA wished to search for in Barnard's room, nor did he place any parameters on the scope of the search or did Barnard ask for any. 9/17/07 Tr. at 64. In no way was that consent to search limited – by Barnard or Miller – to a search for drugs and/or drug paraphernalia. *Id.* at 59-60, 77. The second consent, given by Barnard while in Collins's car outside 431 Howell Drive, likewise had no restrictions placed (by either party) on the object of the search. *Id.* at 41, 71.

Only the third consent to search was restricted, but this consent was more like an invitation than an acquiecence. Indeed, the record demonstrates that Barnard directed and invited Collins to enter 431 Howell Drive, go into Barnard's bedroom, and search for paperwork, either a work schedule or a pay stub. *Id.* at 55, 57-58.

The defendant makes much of the fact that: (1) P&P's search resulted in no seizure of drugs or drug paraphrenalia and (2) that Officer Latsko's subjective opinion that she (P&P) was searching for drugs somehow negates the defendant's open-ended consent to search his room. Def. Br. in Support at "Argument" pgs. 1-2. This argument is without merit. First, Collins indicated his understanding that P&P was searching for "any contraband or anything that would violate [Barnard's] probation further." *Id.* at 54. Pini likewise believed that, while the "main thing" P&P officers were searching for was drugs, that they were also looking for "contraband."

14

7/19/07 Tr. at 22. Second, and more important, Barnard's request that Collins go inside and retrieve documents gives lie to any attempt by the defendant to engage in a post-hoc limitation on the scope of his consent, or the scope of the search, to merely a search "for drugs." The defendant placed no such contemporaneous restriction on his request of Collins. *Id.*

When probation officers informed Collins about the discovery of paperwork in various names (Dion Barnard, Ross Cephas, Ross Money), Collins recognized the evidentiary value of this information in connection with the January 12, 2006 cocaine base distribution, requested the letters, and seized them while in Barnard's bedroom. *Id.* at 54-55. Therefore, at a minimum, Collins's search and his subsequent seizure, while still in Barnard's room, of paperwork shown to him by the probation officers, clearly falls within the scope of Barnard's third consent, irrespective of the scope or intended scope of P&P's search.[10]

### 2. The Search Is Also Valid and Lawful Because Dorinda Richardson, The Owner of 431 Howell Drive, Consented To It.

Even if one assumes that the P&P officers were unaware of Barnard's consent to search offered in the presence of TFOs Collins, Santos and Agent Miller at P&P's offices and further unaware of Barnard's reaffirmation of that consent to both Agent Miller and TFO Collins outside 431 Howell Drive, the record certainly demonstrates that they were aware of and present for Dorinda Richardson's separate consent to that search. Ms. Richardson came to the door and

---

[10] Assuming *arguendo* that this Court finds, by a totality of the evidence, that the defendant's first two consents were not voluntary, or finds the fact that P&P officers physically executed the search to suggest that the first two consented-to searches were not effected, the paperwork/letters seized by TFO Collins from Barnard's bedroom nonetheless are admissible at trial, even under the defendant's "plain view" theory. *See United States v. Menon*, 24 F.3d 550, 562-63 (3d Cir. 1994)(documents held to be lawfully seized even though evidentiary value was obvious only after their review by fellow officer on the scene; "immediate apparency of criminality" to be measured by collective knowledge of officers on the scene).

spoke to the officers when Agent Miller and the P&P officers arrived at 431 Howell Drive. 9/17/07 Tr. at 14, 29, 70. Upon being informed of the purpose of their presence at the house, Richardson consented to the search. *Id.* Moreover, Richardson directed the officers, including Agent Miller who was also standing at the door, to Barnard's room. *Id.* at 26-27, 29.[11]

As the homeowner, Ms. Richardson had a reasonable expectation of privacy in 431 Howell Drive. *Id.* at 29. Accordingly, she could – and did – give consent to search the home, including the defendant's bedroom to which she directed the officers, because she had common authority over the place to be searched. *See, e.g., United States v. Gonzalez*, 71 F.3d 819, 827 (11th Cir. 1996)(homeowner had authority to consent to search of room where defendant previously stayed - no evidence to suggest homeowner had relinquished common control over room where defendant had stayed). While it is the government's burden to establish that common authority exists, *see, e.g., Illinois v. Rodriguez*, 497 U.S. 177, 181 (1990)(*citing United States v. Matlock*, 415 U.S. 164, 171, n.7 (1974)), there is no evidence in the record that the defendant's room was kept locked or that Ms. Richardson's access to that room in any way was restricted. Rather, the evidence supports her common authority. Richardson was present at the house when the search began, it was her home in which the defendant was staying and which was to be searched, and she consented to that search and directed the officers to Barnard's room. 9/17/07 Tr. at 26-27, 29.

---

[11] While the government's burden to show voluntariness cannot be discharged by consent merely given in "acquiescence to a claim of lawful authority," *see Bumpers v. North Carolina*, 391 U.S. 543, 549 (1968), the record here indicates not mere "acquiescence" to the fact that law enforcement was going to conduct a search of Ms. Richardson's house, but rather that she consented to the search of her home after a P&P officer "explained why they were there, and asked if it was okay to search. And [Richardson] said, yes, and allowed them in." *Id.* at 70.

Indeed, even assuming that she did not have authority to consent to the search of the defendant's room, Ms. Richardson clearly had the "apparent authority," on which the officers present at the scene could in good faith reasonably rely based on all the facts known to them at the time. *See Rodriguez*, 497 U.S. at 186. Thus, Ms. Richardson's consent to the search of the house gives further and independent grounds for this Court to find the search and seizure of items from 431 Howell Drive was valid.

### 3. The Documents/Letters Seized From 431 Howell Drive Are Also Admissible At Trial Under The "Inevitable Discovery" Doctrine.

When the government demonstrates, by a preponderance of the evidence, that illegally obtained evidence would have been discovered anyway through a lawful means, the doctrine of inevitable discovery keeps that evidence from being suppressed at trial. *See Nix v. Williams,* 467 U.S. 431 (1984). Thus, even assuming, *arguendo*, that the search and/or seizure of items from 431 Howell Drive was improper or was not the search to which Barnard consented, if the items seized from 431 Howell Drive would have been discovered anyway, they are admissible at Barnard's trial.

The rationale for application of this doctrine in the present context is simple. When, as here, the "preponderance of the evidence [demonstrates] that the information [at a minimum the letters/documents seized by Collins while in Barnard's bedroom] ultimately or inevitably would have been discovered by lawful means . . . then the deterrence rationale [of the exclusionary rule] has so little basis that the evidence should be received." *Id.* at 444. *See also United States v. Vasquez De Reyes*, 149 F.3d 192, 195 (3d Cir.1998)("inevitable discovery doctrine has generally been applied in the context of acquiring physical evidence, such as drugs or weapons."). This

17

doctrine "focuses on demonstrated historical facts capable of ready verification and impeachment," and the government can meet its burden by showing "that the police, following routine procedures, would inevitably have uncovered the evidence." *Id.* Here, the documents/letters referred to by TFO Collins in the suppression hearing as letters, 9/17/07 Tr. at 54, are admissible under the inevitable discovery doctrine even if this Court is concerned about the fact that P&P officers conducted the physical search and initial seizure of those items.

At some point while outside 431 Howell Drive with the defendant, Barnard asked TFO Collins to go into the house and retrieve paperwork relating to Barnard's work schedule that Barnard thought were "by the television." *Id.* at 55. Thereafter, consistent with the defendant's request, TFO Collins entered 431 Howell Drive. *Id.* at 55, 57-58. Once inside, P&P officers showed Collins documents/letters in the name of Dion Barnard and in the names of Ross Cephas and Ross Money. *Id.* at 41, 54-55. Despite adequate opportunity through cross examination to impeach TFO Collins's version of the events that led to his entry into 431 Howell Drive and his seizure of the subject letters/documents, Collins's version of the events remains uncontested.

Had the P&P officers not found those documents, the police (here TFO Collins) following regular search procedures based upon Barnard's consent/invitation to search for work-related documents, would inevitably have discovered the letters within Barnard's room. *De Reyes*, 149 F.3d at 195. The found letters patently fall within the category of "documents." TFO Collins clearly was authorized – indeed, directed – by the defendant to search for a type of documents, his work schedule/pay stubs. It is true that the found letters/documentation were not pay stubs. It is likewise true that Collins did not find the work documentation Barnard referenced, nor even search Barnard's room. *Id.* at 53. Had Collins lawfully searched for

18

documentation of Barnard's work history, however, the preponderance of the evidence

demonstrates that he invariably would have come across the very letters Collins took from P&P

while still in Barnard's room based on its evidentiary value in connection with the January 12,

2006 cocaine base distribution. *Id.* at 54. That the letters/documents were found first by the

probation officers does not change the fact that would have been found by Collins whom

defendant Barnard specifically directed to go into 431 Howell Drive for the purpose of searching

for work-related documents. Accordingly, at a minimum, the letters/documents seized by Collins

would have been discovered through a lawful search, and they should not be suppressed.

### 4. The Defendant's Post-Arrest Statements Were Made After The Defendant Was Informed Of, And Waived, His Rights Pursuant to *Miranda v. Arizona* And/Or Were Voluntarily Made; Accordingly They Should Not Be Suppressed.

The defendant argues for suppression of all statements he made prior to and during the

probation search of his residence. D.I. 23. In his brief, the defendant contends that the

statements were made in violation of his *Miranda* rights and should be suppressed. Def.'s Br. in

Support at "Conclusions of Law" ¶¶ 4 & 5. Suppression hearing testimony demonstrates that

Agent Miller satisfied the requirements of *Miranda v. Arizona*, 384 U.S. 436, 478 (1966), and

that the defendant's *Miranda* waiver was knowing, voluntary, and intelligent. Moreover,

*Miranda* warnings are not required prior to voluntary question/statements, such as the

defendant's question: "Who set me up?" 9/17/07 Tr. at 36, 65. Finally, while *Miranda*

warnings must be given prior to custodial interrogation, they are not required prior to a request

for consent to search the defendant's residence. *See, e.g., United States v. Stevens*, 487 F.3d 232,

242 (5th Cir. 2007)(*Miranda* warnings not required to validate in-custody consent searches

because statements of consent are "not testimonial within meaning of 5[th] Amendment)(*citing*

cases from sister circuits). Thus, a valid *Miranda* warning and waiver prior to a request for a

consent search is not a prerequisite to introduction of Barnard's in-custody statements granting

that content. *Id.* Accordingly, defendant's motion to suppress statements should be denied in its

entirety.

### a. Standard of Review.

The government bears the burden to prove the voluntariness of the defendant's custodial

statements --and any *Miranda* waivers-- by a preponderance of the evidence. *Missouri v. Seibert*,

542 U.S. 600, 609 n.1 (2004)(*citing Colorado v. Connelly,* 479 U.S. 157, 169 (1986) and *Lego v.*

*Twomey*, 404 U.S. 477, 489 (1972)). As with consents to search, the Third Circuit looks to the

totality of circumstances in deciding whether a statement was voluntarily given. *United States v.*

*Swint*, 15 F.3d 286, 289 (3d Cir. 1994)(citations omitted). Factors to be considered in this

totality of the circumstances analysis include the length and location of the interview, the

defendant's age, physical, and mental condition, the official's assent or failure to advise the

defendant of his rights to remain silent and to have counsel present during questioning, and the

defendant's prior experience with the criminal justice system. *Swint*, 15 F.3d at 289. "Police

overreaching," *e.g.,* coercion of the defendant by law enforcement causally connected to the

defendant's statements, is a prerequisite to a finding that the defendant's statement was

involuntarily given. *Id.* (*citing Colorado v. Connelly*, 479 U.S. at 164). The record is utterly

devoid any such evidence of overreaching here.

### b. Barnard's Utterance "Who Set Me Up?" Was A Volunteered Statement Not Requiring A Valid Prior *Miranda* Warning.

In-custody statements that are volunteered do not require *Miranda* warnings to avoid

suppression. *Colorado v. Connelly*, 479 U.S. at 478; *Miranda*, 384 U.S. at 478 (volunteered

statements "not barred by the Fifth Amendment"). Instead, *Miranda* warnings are required only

for custodial interrogation, with interrogation being defined to include "'express questioning or

its functional equivalent. That is to say, the term 'interrogation' under *Miranda* refers not only to

express questioning, but also to any words or actions on the part of the police (other than those

normally attendant to arrest and custody) that the police should know are reasonably likely to

elicit an incriminating response from the suspect.'" *United States v. Calisto*, 838 F.2d 711, 716

(3d Cir. 1988)(*quoting Rhode Island v. Innis*, 446 U.S. 291, 300-302 (1980)).

Here, the defendant's statement to Agent Miller and TFO Collins, "Who set me up?" was

made immediately after his *Miranda* warnings were given. 9/17/07 Tr. at 36, 66. That

statement, made without any questioning whatsoever beyond the stated *Miranda* rights

advisement pursuant to Miller's DEA-13A card, was voluntarily provided. Even assuming,

*arguendo*, that this Court could find a *Miranda* violation here, this statement stands as

voluntarily made under the totality of record evidence from the suppression hearing.

Agent Miller and TFO Collins testified that, at the time of his arrest and thereafter, the

defendant was coherent and did not appear to be under the influence of drugs or alcohol or

suffering from any mental or physical disability. Barnard likewise appeared to understand the

English language without problem. 9/17/07 Tr. at 36, 66. As an active probationer, the

defendant clearly had prior experience with the criminal justice system. *Id.* at 7. Barnard's

demeanor was described as "calm" and "cooperative." *Id.* at 38, 67. Further, no threats or

promises were made to the defendant at the time of his arrest or thereafter. *Id.* at 36-37, 39, 66,

68-69. Therefore, the preponderance of the record evidence supports finding by this Court that

all the defendant's in-custody statements (including those made as a result of *Miranda*-requiring custodial interrogation) were voluntarily made and should be admissible at trial.

### c. Agents Miller and Collins Complied With *Miranda v. Arizona;* Statements Made By The Defendant As The Product of "Custodial Interrogation" <u>Should Be Admissible At Trial.</u>

Under *Miranda*, before suspects in custody, including the defendant here, are interrogated, they are to be informed: (1) that they have a right to remain silent; (2) their statements may be used against them at trial; (3) they have the right to the presence of an attorney during questioning; and (4) if they cannot afford an attorney, one will be appointed for them. 384 U.S. at 478-79. While these warnings do not have to be conveyed exactly, *Miranda's* essential message must have been conveyed to the defendant. *See, e.g., United States v. Cruz*, 910 F.2d 1072, 1078-79 (3d Cir. 1990).

As stated above, the government bears the burden to prove, by a preponderance of the evidence, that the defendant waived his *Miranda* rights, *see Colorado v. Connelly*, 479 U.S. at 168, and that the waiver was a knowing, voluntary, and intelligent one. The voluntariness of a waiver is judged by the same "totality of the circumstances" as the voluntariness of a statement. *See id.* at 169-70.

Agent Miller and TFO Collins each testified about the circumstances of Barnard's post-arrest statements to them. Agent Miller explained that, while in the hallway with Barnard and Collins, he read the defendant his *Miranda* rights from a DEA-13A card, described as "a little yellow *Miranda* card," pursuant to his typical practice. 9/17/07 Tr. at 65-66. Agent Miller specifically noted that he did not advise the defendant of his rights from memory, because "I read from the card always." *Id.* at 66.

22

After being informed of his rights as set forth on the DEA-13A card, the defendant

replied "yeah." *Id.* at 65. In further response to one of the questions on the card, "Are you

willing to answer any questions?" the defendant looked at Miller and said, "Who set me up?" *Id.*

TFO Collins testified that he heard "[Barnard] answer in the affirmative when he was asked

about his *Miranda* rights. And he also asked who had set him up." *Id.* at 36. Collins thus

confirms Miller's *Miranda* advisory to Barnard, and Barnard's waiver.

The defense is correct that the DEA-13A card was not introduced into evidence.[12]

Nonetheless, the preponderance of record evidence clearly demonstrates that the defendant was

apprised of, and waived, his *Miranda* rights. First, Agent Miller had been a Special Agent with

the DEA for over sixteen years at the time of Barnard's arrest. *Id.* at 61. Agent Miller thus is an

experienced officer, accustomed to advising defendants of their *Miranda* rights. Miller's

familiarity with the rights set forth in *Miranda* is evidenced by his practice of "always" reading

those rights, so as not to forget anything, directly from the DEA-13A card, a policy the

preponderance of the evidence suggests he complied with on this occasion. *Id.* at 66.

Following the Supreme Court, the Third Circuit has recognized that the --at least

impliedly preferred but not required-- method for informing defendants of their rights is by

reading off of a pre-printed *Miranda* card, such as that Miller testified to using here. *Cruz,* 910

F.2d at 1078-79 (noting that the Supreme Court in *Duckworth v. Eagan,* 492 U.S. 195, 202

(1989) "explained that *Miranda* warnings do not have to be given in the exact words that the

court scribed in its landmark *Miranda* decision. . . . [The *Duckworth*] Court noted that officers in

---

[12] This failure was due to government counsel's inability to find the requisite exhibit
copy of the DEA-13A card during the hearing. Tr. at 65. This card is the standard *Miranda* card
issued to DEA Special Agents.

the field sometimes may not have access to printed *Miranda* warnings (*e.g.*, while working undercover) and that it is sufficient for an officer to provide the functional equivalent of the *Miranda* warnings from memory.").

Moreover, the Court need not rely solely upon Agent Miller's recollection of the reading of those rights to the defendant here. TFO Collins testified that he also heard "[Barnard] answer[] in the affirmative when asked by Miller about his *Miranda* rights." 9/17/07 Tr. at 36. The government maintains that the preponderance of record evidence supports a finding by this Court that the defendant was fully informed of his rights pursuant to *Miranda* and that he voluntarily waived those rights. Once again, even if the Court views the evidence in a different light, that decision would not affect the admissibility of Barnard's utterance: "Who set me up?" That statement is a voluntary utterance the admission of which is not dependent upon the validity of Barnard's *Miranda* waiver. *See* discussion *supra*.

### d. *Miranda* Warnings Were Not Required Prior To DEA's Request For Consent To Search.

Even assuming, *arguendo,* that the Court finds Agent Miller's and TFO Collins's hearing testimony regarding the provision of *Miranda* warnings to the defendant somehow insufficient to satisfy the government's burden, that violation does not work to taint the subsequent, valid consensual search of 431 Howell Drive, as discussed *supra*. Contrary to defendant's argument, Def. Br. in Support at "Conclusion of Law" ¶ 4, "[t]he failure of officials to give *Miranda* warnings before asking for consent does not prohibit the use of a defendant's in-custody statements granting consent to a search." *Stevens*, 487 F.3d at 242-43 and n.3 (citing cases for the proposition that statements of consent are "not testimonial" in the 5th Amendment sense and

24

therefore valid prior *Miranda* warnings and waivers are not required to introduce the consent

statements at trial). *Cf. United States v. DeSumma*, 272 F.3d 176, 180-81 (3d Cir. 2001)

(exclusionary rule does not require suppression of derivative evidence recovered as fruit of a

voluntary statement that was provided prior to the provision of *Miranda* warnings).  The

defendant's motion to suppress statements thus fails *in toto*.

## III.  CONCLUSION

WHEREFORE, for the foregoing reasons, the government respectfully requests this Court

deny the defendant's motions to suppress statements and evidence.


Respectfully submitted,

COLM F. CONNOLLY
United States Attorney

By:

Shannon Thee Hanson
Assistant United States Attorney
1007 N. Orange Street, Suite 700
Wilmington, Delaware  19899
(302) 573-6277 x128


Dated: October 29, 2007

## IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | : | |
| | : | |
| Plaintiff, | : | |
| | : | |
| v. | : | Cr. A. No.  06-73-GMS |
| | : | |
| DION L. BARNARD, | : | |
| | : | |
| Defendant. | : | |

### CERTIFICATE OF SERVICE

I, Shannon T. Hanson, employed with the Office of the United States Attorney for the District of Delaware, hereby certify that on the 29th day of October 2007, I caused to be filed the Government's Memorandum In Opposition to Defendant's Motion To Suppress Evidence and Statements with the Clerk of Court via CM/ECF.  I further certify that a copy of the foregoing was sent, via facsimile and electronic mail on October 29, 2007 and sent via First Class Mail on October 30, 2007 to counsel of record as follows:

Joseph A. Ratasiewicz, Esq.
Front Street Lawyers
2 W. Baltimore Avenue, Suite 320
Media, PA 19063

Shannon T. Hanson