## IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Criminal Action No.  06-73-GMS |
| | ) | |
| DION L. BARNARD, | ) | |
| | ) | |
| Defendant. | ) | |

### GOVERNMENT'S OPPOSITION TO MOTION TO DISMISS INDICTMENT

The United States, by and through Colm F. Connolly, United States Attorney for the

District of Delaware, and Lesley F. Wolf, Assistant United States Attorney for the District of

Delaware, hereby opposes defendant's Motion to Dismiss the Indictment (D.I. 55) for the

reasons set forth below:

1.    Trial in the above action commenced on May 12, 2008.  On May 13, 2008, after

four witnesses testified in the prosecution case, the defendant moved for a mistrial, during the

testimony of the government's fifth witness.  After hearing argument from the parties, the Court

granted defendant's motion.

2.    The Motion for a mistrial resulted from questions and answers during which a

witness, Deputy United States Marshal Robert Henderson, testified concerning defendant's FBI

number and referred to the possibility that defendant may have previously been arrested.

3.    In granting defendant's motion, the Court stated it was a "mistrial without

prejudice," indicating that the parties would have the "opportunity to brief the whole issue of whether a retrial should be permitted."  (Tr. 19.)[1]

4.     On June 9, 2008, Defendant filed a Motion to Dismiss Indictment (D.I. 55.), asserting that the Court should dismiss the indictment because the questioning of Deputy Marshal Henderson was "intended to 'goad' the defense into moving for a mistrial," and accordingly retrial is barred on "'double jeopardy" grounds.

5.     Where a defendant moves for a mistrial, he may generally not claim that the Double Jeopardy Clause bars retrial.  See United States v. Jorn, 400 U.S. 470, 485 (1971).  However, a narrow exception exists permitting a defendant to raise such a claim "only where the government conduct in question is intended to 'goad' the defendant into moving for a mistrial."  Oregon v. Kennedy, 456 U.S. 667, 676 (1982).

6.     In seeking to bar retrial, defendant bears the heavy burden of demonstrating that the "prosecutor [intended] to subvert the protections afforded by the Double Jeopardy Clause."  Id.; see also United States v. Williams, 472 F.3d 81 (3d Cir. 2007) (reversing district court's dismissal of indictment where defendant failed to show subjective intent of prosecutor to cause mistrial); United States v. Dinzey, 259 Fed. Appx. 509, 2007 WL 4455385 (3d Cir. Dec. 20, 2007) (affirming denial of motion to dismiss where defendant failed to present evidence of intent to cause mistrial).  Here, defendant has utterly failed to meet his burden.  Indeed, the defendant has failed to cite to any evidence demonstrating the intent of the prosecutor to provoke a mistrial.

---

[1]The transcript of the Court's colloquy on the Motion for Mistrial is attached as Exhibit 1.

7.    Although the Supreme Court in <u>Kennedy</u> did not set forth specific factors to guide a court's inquiry, lower courts have considered three factors to be of significance in analyzing a motion to dismiss the indictment after a mistrial has been granted: (1) if the prosecutor had reason to think a defendant might be acquitted; (2) if the government might gain from a mistrial; and (3) if the prosecutor offered a "plausible justification" for the actions that led to the mistrial. <u>United States v. Archibald</u>, 2003 WL 561096 at *5 (E.D. Pa. Feb. 26, 2003) <u>citing</u> <u>United States v. Curtis</u>, 683 F.2d 769, 777-78 (3d Cir. 1982).[2]   In the instant case, all three factors militate in favor of denying defendant's motion.

8.    First, defendant has cited no reason to believe that the prosecutor might think that defendant would be acquitted.  At the time of defendant's motion for mistrial, the government had presented four witnesses, including a witness who testified to engaging in the charged drug transaction with defendant.  Although witnesses had been cross-examined, no significant evidence had been excluded and there was no evidence of any unexpected revelations harmful to the government's case-in-chief.  <u>See</u> <u>Archibald</u>, 2003 WL 561096 at *5 (denying motion to dismiss, in part, because record devoid of evidence of government's perception case going poorly).

9.    Second, defendant has presented no evidence that the government stood to gain by retrying the case.  As set forth above, the case-in-chief proceeded as expected and there were no

---

[2]Courts may also consider the persistent nature of any misconduct prejudicial to defendant in evaluating a motion to dismiss.  <u>See</u> <u>Archibald</u>, 2003 WL 561096 at *6 n.7.  This inquiry is not relevant here as there was no pattern of problematic questioning.  Indeed, defendant did not object to the line of questioning (consisting of eight questions) on which he bases his motion to dismiss until all were asked and answered, at which point he moved for a mistrial.  There was no disregard of judicial ruling or instruction and no persistent pattern of questioning designed to unfairly prejudice defendant.

novel or surprise issues raised by the defense.  Moreover, retrial requires the government to reinvest the time and resources in preparing a second time for trial.  See Curtis, 683 F.2d at 777 (no evidence showing government hoped it might uncover new evidence or otherwise benefit from new trial); Archibald, 2003 WL 561096 at *6 (noting costs to government and benefits to defendant of second trial).

10.    Third, during a colloquy with the Court, the prosecution not only objected to the mistrial and proposed a curative instruction, the prosecutor offered a plausible explanation for the line of questioning which led to defendant's motion, explaining the need to connect defendant's fingerprints taken in the instant arrest with the fingerprints of defendant found in the IAFIS database.  (Tr. 16-17.)    See, e.g., Dinzey, 2007 WL 4455385 at *1 (noting government's opposition to motion for mistrial in affirming retrial); Williams, 472 F.3d at 86 (citing prosecutor's explanation offered at hearing on motion to dismiss as relevant factor in permitting retrial); Curtis, 683 F.2d at 777 (noting that "prosecutor at least proffered some justification for his remarks" in reversing dismissal of indictment).

11.    The Court has already determined that the prosecutor did not attempt to "goad" defendant into moving for a mistrial.  As the Court stated during the colloquy, "I don't think there is any inference here that this was intentional or any effort to prejudice the defendant." (Tr. 9.)  Later in the colloquy, the Court again stated, "I believe, quite frankly, it was inadvertent."  (Tr. 18.)  These statements are consistent with the Court's original ruling, granting the mistrial *without* prejudice and are inconsistent with a finding that the prosecutor subjectively intended to cause a mistrial.  (Tr. 19) (emphasis added).

12.    Defendant has offered no reason or evidence to alter that conclusion.  Defendant has failed to meet his burden because he cannot— the record is devoid of evidence in support of his Motion to Dismiss the Indictment.  Because he cannot meet his burden of showing that the prosecution intended to "'goad' the defendant into moving for a mistrial," his motion should be denied.  Kennedy, 456 U.S. at 676.

WHEREFORE, the United States respectfully requests that the Court deny Defendant's Motion to Dismiss the Indictment and schedule the retrial of this matter.

Respectfully submitted,

COLM F. CONNOLLY
United States Attorney

BY:    s/Lesley F. Wolf
       Lesley F. Wolf
       Assistant United States Attorney

Dated: June 13, 2008

5

**IN THE UNITED STATES DISTRICT COURT**

**FOR THE DISTRICT OF DELAWARE**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Criminal Action No.  06-73-GMS |
| | ) | |
| DION L. BARNARD, | ) | |
| | ) | |
| Defendant. | ) | |

**<u>CERTIFICATE OF SERVICE</u>**

I, Lesley F. Wolf, hereby certify that on the 13th day of June, 2008, I caused to be filed the Government's Opposition to Motion to Dismiss Indictment with the Clerk of Court via CM/ECF.  I further certify that a copy of the foregoing was sent, via First Class Mail postage  to counsel of record as follows:

Joseph A. Ratasiewicz, Esq.
Front Street Lawyers
2 W. Baltimore Avenue, Suite 320
Media, PA 19063

<u>s/Lesley F. Wolf</u>

1          IN THE UNITED STATES DISTRICT COURT.

2          IN AND FOR THE DISTRICT OF DELAWARE.

3

4                              -  -  -

   UNITED STATES OF AMERICA,      :      Criminal Action
5                                 :
                Plaintiff,         :
6                                 :
        v.                         :
7                                 :
   DION L. BARNARD,                :
8                                 :
                Defendant.         :      No. 06-73-GMS
9
                               -  -  -
10
                        Wilmington, Delaware
11                        May 13, 2008
                           1:21 p.m.
12                     EXCERPTED TRANSCRIPT

13                             -  -  -

14   BEFORE:  HONORABLE GREGORY M. SLEET, Chief Judge,
                                        and a Jury
15

16   APPEARANCES:

17          LESLEY F. WOLF, ESQ.
            Assistant United States Attorney
18
                                  Counsel for Government
19
            JOSEPH A. RATASIEWICZ, ESQ., and
20          NICHOLAS CASAMENTO, ESQ.
            Front Street Lawyers, P.C.
21          (Media, PA)

22                                  Counsel for Defendant

23

24

25

 1                  (The following is an excerpt from trial day of

 2      5/13/08.)

 3                  THE COURT:  Please be seated.  Counsel, have you

 4      had a chance to read the transcript I had prepared of the

 5      Officer's testimony?

 6                  I can give you additional time.  You have not

 7      read it yet?

 8                  MS. WOLF:  We just got it.

 9                  THE COURT:  I am going to come back in five

10      minutes, give you a chance to read it.

11                  (Recess taken.)

12                  Counsel, have you had an adequate opportunity to

13      read the transcript?

14                  MS. WOLF:  Yes, Your Honor.

15                  MR. RATASIEWICZ:  Yes.

16                  THE COURT:  I will hear from you, Mr.

17      Ratasiewicz.

18                  MR. RATASIEWICZ:  Your Honor, based on my

19      reading of the transcript, as well as briefly researching

20      some case law up in the law library here at the lunch break,

21      I renew my motion for mistrial.

22                  THE COURT:  Do you want to be more specific in

23      the articulation of your position?

24                  MR. RATASIEWICZ:  Sure.  Looking at Page 2 of

25      the transcript, where the witness indicated that, Line 11,

1    he refers to, "AIFIS (phonetic), which is a repository

2    supervised by the FBI.

3            "Question:  AIFIS is a repository of?

4            "Answer:  Fingerprints."

5            Page 5, he references an FBI number at Line 4,

6    and then jumping down to Line 9, the answer is, "Once we

7    take his fingerprints it gets submitted to AIFIS," relating

8    back to the fingerprint repository, and usually within five

9    to ten minutes we get a response -- I am paraphrasing --

10   that the fingerprint, that the person that was fingerprinted

11   is whoever it is in the database.

12           "In this case he was fingerprinted and it came

13   back to Dion Barnard with that FBI number.

14           Question:  If were given a different name and

15   the prints matched somebody else, would you have received

16   notification?

17           "Answer:  Yes.  It still would have come back to

18   Dion Barnard, though, if he had been previously arrested.

19   So it didn't matter what name he told me."

20           "Question:  So just to be clear -- did that

21   happened here?

22           "Answer:  No.  When he was processed, he gave

23   the correct information.  When it came back from AIFIS, it

24   matched.

25           "Question:  So it matched the person in the

1    AIFIS system known as Dion Barnard?

2              "Answer:  Right.

3              "Question:  That person had the FBI number

4    849624WA5?

5              "Answer:  Yes."

6              I objected at that point.

7              My argument is that it has prejudiced the jury

8    in the sense that the jury is now left to believe Mr.

9    Barnard has an FBI number, has fingerprints on repository

10   with the FBI, and the only way that those fingerprints would

11   be there is based on a prior arrest.

12             THE COURT:  Clearer than that, Line 17, Page 5:

13   "Yeah.  It would have still come back to Dion Barnard,

14   though, if he had been previously arrested."

15             They don't believe -- they know that he has been

16   previously arrested, don't they?

17             MR. RATASIEWICZ:  I think that's quite obvious.

18             THE COURT:  Let's hear from the government.

19             MS. WOLF:  Thank you, Your Honor.

20             The government would oppose the motion for a

21   mistrial at this point in time.  There is existing case

22   law -- I want to separate my discussion leading into the

23   question about the FBI number and repository.

24             There was a lot of discussion of the FBI number.

25   There was no objection made to that testimony leading up and

1    into that.

2              I should also note that counsel was provided

3    with ample notice of the government's intent to use

4    fingerprint evidence in this case, fingerprint evidence that

5    was connected through an FBI number.  There were no motions

6    made in connection with that.

7              THE COURT:  I think I pointed that out during

8    our previous sidebar.

9              MS. WOLF:  The government did actually seek a

10   stipulation regarding the authenticity of the fingerprints

11   that were used, so that they could have been introduced

12   without any issue or necessity to authenticate or connect

13   them to defendant.  That stipulation was declined.

14             THE COURT:  You are not suggesting that they

15   were obliged to stipulate.

16             MS. WOLF:  No, Your Honor.  I am not suggesting

17   that at all.

18             THE COURT:  You are not suggesting that somehow

19   they were derelict in their duty to their client, that is

20   counsel, by not stipulating, are you?

21             MS. WOLF:  No, Your Honor, absolutely not.

22   There is no requirement to stipulate.

23             But I will note that there is a Fifth Circuit

24   decision, 567 F.2d 1309, where the Fifth Circuit upheld a

25   denial of a mistrial in a case where testimony was about

1    photographs which were, in fact, mug shots taken in the

2    course of a prior arrest.  And in upholding the lower

3    Court's decision not to declare a mistrial, the Court of

4    Appeals cited as one of the relevant factors the failure to

5    concede or stipulate to the authenticity and the

6    government's need to lay a foundation and to introduce

7    certain evidence.

8              THE COURT:  With all due respect to my brethren

9    in the Fifth Circuit, I don't think I would follow that

10   rationale, would be inclined to do that.  I would be

11   surprised if the Third Circuit followed that type of

12   rationale in a case like this.

13             Were you able to find any Third Circuit,

14   published Third Circuit precedent on this?

15             MS. WOLF:  Your Honor, I was unable to find any

16   Third Circuit decision, published or otherwise.

17             THE COURT:  We found something unpublished.  But

18   go ahead.

19             MS. WOLF:  I also would cite to a decision under

20   the Fourth Circuit, which states, "The testimony of FBI

21   Agent Burke concerning an FBI number of defendant was quite

22   innocuous because no evil inference was sought from the fact

23   that Taylor did not have an FBI number.  We take judicial

24   notice that substantial numbers in the population who do

25   have FBI numbers are free from crime or other bad repute.

 1   They have been exposed to the FBI" --

 2              THE COURT:   Interrupting.   As you might imagine,

 3   I have been making both sides of this argument during the

 4   course of our break and thinking about a curative

 5   instruction and wondering to myself whether an instruction

 6   just along those lines might suffice -- and I will let you

 7   finish, but I will interrupt from time to time -- to the

 8   effect just suggested, that there are often occasions -- I,

 9   myself, have an FBI number, you have an FBI number, Ms.

10   Wolf.   Ms. Kempski does.   Many involved in law enforcement

11   do.

12              But my concern is that it may or may not be

13   adequate to the task of removing the possibility that that

14   knowledge of the defendant's prior arrest might infect the

15   jury's assessment of the facts, particularly given the

16   nature of this case.

17              What I mean by that is that there is at least an

18   issue of identification, albeit we do have -- it's an

19   interesting case.   It is sort of an identification-plus

20   case, it seems to me.   What I mean by that is, certainly we

21   have an identifying witness.   But the witness is, I will use

22   the word for a lack of a better word, a corrupt source and

23   one who at least has some warts.   And certainly those warts

24   will be discussed, I am sure, during the closing comments of

25   counsel, and will be, I am sure, strongly considered by the

1    jury.

2         So I don't want you to think that I am

3    discounting Mr. Hammond's testimony.  And there is certainly

4    other circumstantial evidence.  And this was part of it,

5    fingerprint on the bag, we haven't yet heard from the

6    expert, who I would imagine would testify in this regard.

7         So I have a concern as to whether that type of

8    instruction would be adequate to the task.

9         Let me let you finish.

10        MS. WOLF:  Your Honor, the curative instruction

11   was, in fact, what the government would propose.  We think

12   that the existence --

13        THE COURT:  Did you have one specifically in

14   mind?

15        MS. WOLF:  I took the liberty of drafting one,

16   which I will read.

17        You have heard testimony that the defendant had

18   an existing FBI number at the time of his arrest in

19   connection with this matter.  I instruct you that an FBI

20   number is just that, a number which is a record of

21   identification, much like a driver's license or Social

22   Security number.  You should not draw any inference about

23   the defendant by virtue of the fact that there is an FBI

24   number attached to defendant's fingerprints.

25        THE COURT:  Something along the lines of what I

1    would have said.  Go ahead.  Let me let you continue with

2    your argument.

3               MS. WOLF:  I think that gets over, I think, the

4    first hurdle, the government's position would be, with

5    regard to the defendant involving the fingerprints, again,

6    that it was repeated, it was done several times without

7    objection.

8               And I think the Fourth Circuit case is sort of

9    relevant because it cites to the part where, it was

10   innocuous, it wasn't designed to elicit that defendant had a

11   number --

12              THE COURT:  I don't think there is any inference

13   here that this was intentional or any effort to prejudice

14   the defendant.

15              MS. WOLF:  Right.

16              The second portion, and I think the comment that

17   Your Honor keyed in on as perhaps being the most problematic

18   from the Court's perspective, is it still would have come

19   back to Dion Barnard, though, if he had been previously

20   arrested, so it didn't matter what name he told me.

21              Now, I think, going on, reading a little

22   further, So Just to be clear, did that happen here?  The

23   answer to that question is actually no.  And then what's

24   said, it came back, it matched.

25              So I don't think that there is actually

1   unequivocal testimony that defendant had been previously

2   arrested.

3           To the extent that the jury may infer or believe

4   that, I also think that it may be possible to draft a

5   curative instruction to that end.

6           The government, of course, would make no further

7   reference in closing or otherwise to the possibility that

8   defendant had been previously arrested.

9           Not having the transcript during the lunch

10  break, I did not have the opportunity to draft a proposed

11  curative instruction.  But there are instances where

12  inadvertently during the course of testimony witnesses

13  improperly testifying or referring to an arrest rather than

14  a conviction --

15          THE COURT:  We had one here where the witness,

16  contrary to some agreement, referred to money that was

17  seized during the course of the search.  I thought that a

18  curative instruction could be problematic, but when it was

19  proposed, gave it.  So I agree there.

20          MS. WOLF:  Your Honor, I think the curative

21  instruction could be to the effect that an arrest is --

22  first of all, can be for any number of things.  It can be

23  more -- because one of our jurors had an underage drinking

24  incident.

25          THE COURT:  That is a former juror, yes.

1    MS. WOLF: A former juror. But that it does not

2   correspond, first and foremost, with conviction of any

3   crime, and that it, in fact, can be in connection with a

4   minor offense. So there is no implication that defendant

5   was previously linked with criminal activity.

6    THE COURT: Sort of on the other side of that --

7   and I will let Mr. Ratasiewicz make his own argument -- but

8   my concern and thought about that as well is that it's the

9   FBI. That carries with it, for lack of a better word, a

10   certain catch. There are certain inferences I think people

11   draw regarding severity of involvement when you have the

12   FBI, when you have the federal government, when people come

13   to this Court, you are in federal court. You I think I

14   understand my point.

15    MS. WOLF: I do, Your Honor. But I believe,

16   coupled with the initial instruction explaining what an FBI

17   number is and, you know, that anyone can have, the police

18   officers have them, I believe school bus drivers, that there

19   is a wide range of people who do have FBI numbers, the

20   pairing of those two instructions would cure any prejudice.

21    THE COURT: Let me give Mr. Ratasiewicz a chance

22   to respond.

23    Mr. Ratasiewicz, why isn't a curative

24   instruction adequate?

25    MR. RATASIEWICZ: I don't think it is adequate,

1    Your Honor.  I don't believe it could be adequate.  As

2    eloquent as you are at times, I just don't believe -- and

3    you are -- but I just don't believe that it would cure this

4    defect.  Up until that moment in this trial, there was

5    absolutely no evidence from the prosecution that Mr. Barnard

6    had any prior criminal dealings -- I will use that term,

7    criminal dealings -- let alone drug transactions.  There has

8    been absolutely no evidence from the prosecution in that

9    regard.

10             And now, the inference given through this Page 5

11   is that he probably does have prior drug dealings.  He

12   probably does have prior dealings, I will call them criminal

13   dealings.  Once that is placed in the jurors' minds, so be

14   it inadvertently, that taints the jury to the point where I

15   don't know that any curative instruction is going to remedy

16   that.

17             That's my major concern with this.

18             THE COURT:  Okay.

19             Let me get you to respond, briefly, if you

20   would, to Ms. Wolf's point about the two points she made,

21   the point about a stipulation, the option of stipulating,

22   thereby avoiding this type of problem, and what is clear

23   from the transcript, the belated -- well, two things, not

24   filing any motions.  I talked about that at sidebar, to

25   limit this, to constrain or put limits, some guidelines on

1    how this testimony would be used.  And that could have

2    easily been done.  And not putting an onus on the defense to

3    stipulate, I don't think that is required.  But during the

4    pretrial conference we could have easily, it seems to me,

5    pursuant to a motion or request orally delivered or made,

6    put proper parameters on the use of this type of testimony,

7    at least to avoid this and waiver.

8              Why wasn't that a waiver, and your several-

9    questions-in, I will call it belated, objection?  Why isn't

10   that waiver, as I think has been suggested?

11             MR. RATASIEWICZ:  Can I address the second thing

12   first?

13             THE COURT:  Sure.

14             MR. RATASIEWICZ:  It's not a waiver because at

15   the time, on Page 2, I am referring to, when it was brought

16   in, it says an FBI repository for fingerprints -- actually,

17   it doesn't say FBI at that point -- it does.  Repository

18   supervised by the FBI for fingerprints.

19             THE COURT:  What line?

20             MR. RATASIEWICZ:  Page 2, starts at Line 11 and

21   down.  I think at that point -- and again, I didn't know

22   where she was going to go after that -- but at that point

23   there is no tie-in yet to this document, to the degree it's

24   going to be tied in on Page 5.  It just says there is

25   actually a repository.  The jury could have thought there

1    could be a repository of fingerprints for everybody in the

2    world or just people in Wilmington or people on the East

3    Coast at that point.

4            But then when you tie that, the AIFIS and

5    repository, to Page 5, and where we get into the fact that

6    clearly the implication is it can only be by a prior arrest

7    or if he had been previously arrested, now you know that the

8    repository exists for arrested people, or at least people --

9    the inference is, arrested people or people that have

10   committed crimes.

11           So we didn't object on Page 2 because we really

12   didn't know where she was going to go with this.  But when

13   we get to Page 5, and she ties it in with that kind of

14   questioning and answers, that's where we raised the

15   objections.

16           So I believe it was timely under those

17   circumstances.  We had no idea where she was going to go

18   with that.

19           In regards to the first point, why we didn't

20   file a motion, again, we suspected that she was going to

21   bring the witness in, he was going to the fact that he

22   handled Mr. Barnard after this January 12th, '06 arrest, he

23   fingerprinted him on the 15th, he was going to say those are

24   the fingerprints that I digitally produced of Mr. Barnard

25   and I sent them on to wherever he sends them, lab, gave them

1    back to the detective or wherever they went.

2              And did you attach a number to it?  Yeah, that

3    number.

4              And I assume, through chain of custody, she was

5    going to say when they got to the fingerprint analysis that

6    they had the same number on them that they had, is it the

7    same number that you -- I am talking about the fingerprint

8    expert, when he comes in, I am assuming she would say is the

9    number on this fingerprint document the same number that was

10   generated by Marshal -- apologize, I forget his last name --

11   but the U.S. Marshal?  They would tie the two numbers

12   together.

13             There was no break in the chain of custody from

14   the time he took the prints until they got to the expert.

15   We were assuming that's where she was going to go.  It would

16   be short and sweet.  We wouldn't probably have had any

17   questions of this man, depending upon what he said, except

18   for the digital part.  But that's a different issue.

19             But once this happened, you know, again, I don't

20   think we needed to file a motion in that regard because it

21   seemed pretty straightforward at the time.

22             THE COURT:  Okay.  Let me hear from Ms. Wolf

23   again.

24             Ms. Wolf, what was the purpose of the

25   fingerprint evidence?

1          MS. WOLF:  From Marshal Henderson?

2          THE COURT:  Yes.

3          MS. WOLF:  It was to connect.  The fingerprints

4     that are actually used by the DEA lab are accessed, as we

5     learned in the course of preparation through trial, not

6     through a fingerprint card that's sent with an arrest, but

7     through the AIFIS system.  What DEA sends is a name and an

8     FBI number.  The fingerprint examiner then goes into the

9     system, pulls up existing prints, and proceeds with the

10    analysis based on that.  So the government, obviously,

11    wanted to be able to connect those fingerprints to the

12    defendant Dion Barnard.

13          In the course of preparing for trial, we got the

14    current fingerprint card, and were able to provide that to

15    the fingerprint examiner, who looked at it and was able to

16    say, yes, those are the same prints that were taken from

17    Dion Barnard that were also taken -- that were existing in

18    the system.  I used the same ones.

19          Unfortunately, when we were looking at the card,

20    it appeared that Deputy Marshal Henderson had been the

21    person who printed.  In the course of preparation, we

22    discovered that while that was most likely the case, the way

23    the system worked was that there was a period of time where

24    the Marshal's Service was having some difficulty with

25    certain Deputy Marshals' passwords and that there was no

1    guarantee.

2              So what we needed to do was to obtain testimony

3    about why the system worked to authenticate the prints, that

4    they in fact belonged to defendant.  So it did require an

5    extra step, a step, quite frankly, we would have liked to

6    have avoided and in a perfect world would have been able to.

7    But we thought it was necessary here to ensure there was no

8    dispute about whose fingerprints were accessed and matched

9    to the print.

10             THE COURT:  Was that made known to the defense?

11             MS. WOLF:  Not in any great detail.  But we let

12   them know we were going to call a witness and it was going

13   to require some additional testimony to authenticate the

14   prints.

15             With regard to ---

16             THE COURT:  Was there another purpose for the

17   prints?

18             MS. WOLF:  No.  That is the purpose of the

19   prints and of Deputy Marshal Henderson's testimony.

20             THE COURT:  Was there going to be some print

21   comparison?

22             MS. WOLF:  Yes.  Our last witness, who we intend

23   to call, is the FBI fingerprint examiner, who would testify

24   to that effect, which, Your Honor, the government obviously

25   believes is an important piece of evidence in this case.  So

1    we wanted to dot our i's and cross our t's with regard to

2    that evidence.  Again, we continue to believe that a

3    curative instruction is appropriate.  I think the argument

4    about the taint and undue taint may -- while I appreciate

5    the concern that it may not sort of give the respect to

6    which I think jurors give instructions and to which jurors

7    take on the responsibilities and duties when they are

8    instructed to sit and hear and render a verdict based on

9    law --

10          THE COURT:  I have been doing this a while now.

11   If anybody feels strongly about that, I do.  I think most

12   judges, we are very protective of our jurors in this regard.

13   I give them great credit for being able to follow my

14   instructions.  And they do follow my instructions.

15          They are generally very bright and able to -- in

16   the main, they get it right.  But we have got to make sure

17   that we give them a correct basis upon which to act.  And I

18   am concerned and afraid in this case that there has -- and I

19   believe, quite frankly, it was inadvertent, that the

20   government has inadvertently tainted that ability through

21   the testimony of this witness to enable this jury to do

22   that.

23          So I am going to act out of an abundance of

24   caution and grant the motion in this case for a mistrial.

25          I will leave it to counsel to -- the government

1    has some decisions to make as to how it wants to proceed, a

2    decision to make as to how it wants to proceed.  And the

3    defense will have to figure out how it wants to respond to

4    that decision.

5                    MS. WOLF:  Is that a mistrial without prejudice?

6                    THE COURT:  That is a mistrial without

7    prejudice.  I would offer to the parties the opportunity to

8    brief the whole issue of whether a retrial should be

9    permitted.  I would imagine, the high quality of the

10   lawyering that's been done by both sides, I should expect

11   that I am going to be, should expect to be getting a motion

12   of some sort seeking to preclude a trial.  But I would ask

13   that once you communicate with one another, that you then

14   see if you can agree on a briefing schedule, submit that

15   schedule to the Court for my approval.  And I will make a

16   decision.  Okay?

17                   MS. WOLF:  Thank you, Your Honor.

18                   THE COURT:  Mistrial is granted.

19                   MR. RATASIEWICZ:  Thank you, Your Honor.

20                   THE COURT:  We are in recess.  And I will

21   dismiss the jury on my own.

22                   (Court recessed at 1:55 p.m.)

23                       -   -   -

24   Reporter:  Kevin Maurer

25