

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | |
| | : | CR CASE NO. 06-73  6 M ⟨ |
| vs. | : | |
| | : | |
| DION L. BARNARD | : | |
| Defendant | : | |

## MEMORANDUM OF LAW IN SUPPORT
## OF MOTION TO DISMISS INDICTMENT

And now, comes the Defendant, Dion L. Barnard, by and through his attorney,

Joseph A. Ratasiewicz, Esquire, and files the within Memorandum of Law in Support of

Motion to Dismiss Indictment which Motion was filed on June 9, 2008: (Attached as

Exhibit "A")

### I.    BACKGROUND:

Defendant was indicted on June 7, 2006 and charged with violating Title

21, United States Code §841.  On May 12, 2008, jury selection was commenced resulting

in twelve (12) jurors and two (2) alternates to hear the case. Thereafter, trial commenced

on the afternoon of May 12, 2008. On May 13, 2008, during the government's case,

direct examination was being conducted of witness U.S. Marshall Robert Henderson.

During said examination, Assistant U.S. Attorney, Lesley Wolf, inquired of witness

Henderson concerning fingerprint acquisition of Defendant Barnard. Upon questioning

witness Henderson, inquiry was made into the source of the acquisition of matching the

fingerprints to Defendant Barnard. As a result of Assistant U.S. Attorney Wolf's

questioning of witness Henderson, the jury came to learn that Defendant Barnard most

likely had a prior criminal record. As a result of said questioning of witness Henderson,

defense attorney objected and the Court asked of defense counsel "What is your request of the Court"? to which the defense moved for a mistrial. After the lunch break, for the allowance of all parties to research the Motion, discussions were held in open Court with regard to declaring a mistrial. At the conclusion of the discussions, the Court, "out of an abundance of caution" granted the mistrial. (Tr.18 of C) (Attached as Exhibit "C").

## II.   ARGUMENT

Generally, where a mistrial is granted on a Defendant's Motion when the prosecutor's conduct is viewed as harassing or over-reaching, a retrial is not barred absent an intent on the prosecutor to subvert the protections afforded by the "Double Jeopardy Clause". Oregon v. Kennedy 456 U.S. 667 (1982). In declaring that the Double Jeopardy Clause bars a new trial after a Defendant has moved for a mistrial, and such was granted, involves the Court's determining whether or not the Government intended to "goad the defense into moving for a mistrial". Kennedy.

In United States v. Archibald, 2003 WL561096 @*5 (E.D. Pa. Feb. 26. 2003) the Appellate Court generally looked at three (3) factors in deciding on a Motion to Dismiss Indictment when a mistrial is granted:

1)   Did the prosecutor have reason to think that Defendant might be acquitted;

2)   Might the Government gain from a mistrial; and

3)   Whether the Prosecutor offered "plausible justification" for the actions which led to the mistrial.

Looking to factor #1, it is understandable that the Prosecutor had reason to think that the Defendant might be acquitted. During the second day of trial it became clear that

witness Hammond's credibility for honesty was in serious doubt. Hammond was an

admitted criminal who had character issues exposed on the stand. After Detective

Miller's testimony, the jury was left to doubt the veracity of the Government's claims

that the audio transcripts published to the jury were accurate and identification of the

Defendant was in doubt. The Government thus had reason to think that the Defendant

might be acquitted and as the Court gleaned after viewing witness Hammond. (Tr. 7 of

C).

> "They have been exposed to the FBI –
> THE COURT: Interrupting. As you might
> imagine, I have been making both sides of
> this argument during the course of our break
> and thinking about a curative instruction and
> wondering to myself whether an instruction
> just along those lines might suffice – and I will
> let you finish, but I will interrupt from time to
> time – to the effect just suggested, that there
> are often occasions – I, myself, have an FBI
> number, you have an FBI number, Ms.Wolf.
> Ms. Kempski does. Many involved in law
> enforcement do.
>
> But my concern is that it may or may not be
> be adequate to the task of removing the
> possibility that that knowledge of the defendant's
> prior record arrest might infect the jury's assessment
> of the facts, particularly given the nature of this
> case.
>
> What I mean by that is that there is at least an issue
> of identification, albeit we do have – it's an interesting
> case. It is sort of an identification-plus case, it
> seems to me. What I mean by that is, certainly we have
> an identifying witness. But the witness is, I will use the
> word for a lack of a better word, a corrupt source and one
> who at least has some warts. And certainly those warts
> will be discussed, I am sure, during the closing comments
> of counsel, and will be, I am sure, strongly considered by
> the jury.

> So I don't want you to think that I am discounting Mr. Hammond's testimony. And there is certainly other circumstantial evidence. And this was part of it, fingerprint on the bag, we haven't yet heard from the expert, who I would imagine testify in this regard.
>
> So I have a concern as to whether that type of instruction would be adequate to the task".

Looking to factor #2, it can be reasonably determined that the Government might gain from a mistrial. Given that the Government's case was close to being concluded (i.e. only two (2) remaining witnesses after four (4) had so testified), the Government had gleaned from cross examination the direction of Defendant's case. Upon a retrial, the Government has the distinct advantage of cleaning up those areas to which witnesses had already testified (i.e. Hammond) and evidence (i.e. audio transcripts) presented. Also upon retrial, the Government would be able to plug up any and all holes in its case that became apparent at the original trial of this matter.

Looking to factor #3, we can find no plausible justification for the Prosecutor's actions which blatantly informed the jury that the Defendant already had a set of fingerprints on file with the FBI. Clearly, the Prosecutor had other means of getting this witness's testimony on the record regarding this Defendant without going into the Defendant's criminal history background with the FBI. Witness Henderson would not have testified to the Defendant having had fingerprints archived with the FBI but for the Prosecutor's direct and intentional solicitation of such information. In particular, during witness Henderson's direct testimony the Prosecutor solicited: (See attached as Exhibit "B" Tr. 4,5, & 6)

> Henderson Direct
> Q.    "Does this particular record list an FBI number associated with Dion Barnard?

A.    Yes. It does.
Q.    Could you please tell the jury what the number is?
A.    It's 849624WA5.
Q.    Was that number manually entered, inputted, at
      the time he was processed?
A.    No.
Q.    How does that number get into the record?
A.    Once we take his fingerprints it gets submitted
      to AIFIS, and usually within 5 to 10 minutes
      we get a response saying that person that was
      fingerprinted is whoever it is in the database.
      In this case he was fingerprinted and it came back
      to Dion Barnard with that FBI number.
Q.    If the Defendant had given you a different name, and
      the prints matched somebody else that you had in the
      system, would you have received notification of that?
A.    Yeah. It would have still come back to Dion Barnard,
      though, if he had been previously arrested. So it didn't
      matter what name he told me.
Q.    So just to be clear—did that happen here?
A.    No. When he was processed, he gave the correct
      information. And when it came back from AIFIS, it
      matched.
Q.    So it matched the person in the AIFIS system known
      as Dion Barnard?
A.    Right.
Q.    That person had the FBI number 849623WA5?
A.    Yes."

The Prosecutor merely had to elicit from witness Henderson that he was a U.S.

Marshall, took the fingerprints of the Defendant on a specified date and time, and that a

number was attached to the fingerprints; to go beyond that, had no "plausible

justification".    The Prosecutor took a calculated risk to try to win back the jury by

introducing evidence of the Defendant's prior criminal history. At this juncture of the

trial, the Prosecutor had nothing to lose by introducing such evidence, if it gets in then it

helps her case, of it is objected to and a mistrial is ultimately granted, then the Prosecutor

uses the first trial as a "dry run".

Although the Court indicated during the afternoon argument that "I don't think (emphasis added) there is any inference here that this was "intentional" or any effort to prejudice the Defendant" (Tr. 9 of C), when the transcript of the questions asked by the Prosecutor are analyzed there is clearly a pattern and method to such questioning that was unnecessary. Even the Prosecutor admits in her argument to the Court that

"... the Government's position would be, with regard to the Defendant involving the fingerprints, again, that it was repeated, it (emphasis added) was done several times without objection". (TR 9 of C). It's an admission by the Prosecutor that she intended to go down this line of questioning until the defense objected; just the sort of provocation or "goading" referenced in Kennedy and United States v. Curtis, 663 F. 2d 769, (3d Cir. 1982). And as in Archibald, there was a persistent pattern of questioning by the Prosecutor designed to ultimately prejudice the Defendant. In particular, the Prosecutor states "Your Honor, he is not going to discuss that reference (dangerous drugs). He is here to authenticate the fingerprints"; (Tr. 4 of B) however, the witness had already authenticated the fingerprints as evidenced in the following exchanged (at Tr. 2 & 3 of B):

> Henderson Direct
> Q. Was there a prisoner named Dion Barnard processed by the United States Marshall Service on June 26, 2004 or June 15, 2006?
> A. Yes.
> Q. And were fingerprints taken of Dion Barnard on that day?
> A. Yes.
> Q. Showing you what's been marked Government Exhibit 19. Do you recognize that?
> A. Yes.
> Q. What is that?
> A. That is a JABS record of fingerprints and biographical information on Dion Barnard.
> Q. Does it have a date that that was taken?

> A.  Yes, it does.  June 15, 2006.
> Q.  Is that an accurate copy and record of that fingerprint?
> A.  Yes.

Thus, there cannot be any plausible reason to ask witness Henderson any further

questions regarding the authentication of Defendant's fingerprints.  The next set of

questions by the Prosecutor on (Tr.5 of B) could only have been intended to solicit

information of Defendant's prior record until the defense objects (as the Prosecutor raised

a waiver issue by Defendant failing to timely object). (Tr. 4 & 5 of C).  The persistent

pattern of the questioning would have continued had the defense not objected.

(Tr. 5 of B).  The Court clearly recognized what the persistent pattern of questioning had

done when it stated : " The jury now knows he has a prior record". (Tr. 6 of B).

Furthermore, another demonstration of the prosecution's intent was their

explanation to the Court of their need to ask Henderson further questions.  The Court

inquired: "Was that made known to the defense". (Tr. 17 of C) [referring to fingerprint

access via AIFIS].  The Prosecutor's response was "Not in any great detail" (Tr.17 of C),

which begs the question (Why wasn't it made known to the defense?).  Either the

Prosecutor withheld discoverable information (i.e. that there was some difficulty with

passwords and that the DEA had originally used AIFIS prints for comparison and not the

print card by Marshall Henderson), (Tr. 17 of C), or, they knew that the use of AIFIS

prints for comparison could possibly allow them to introduce the Defendant's prior

record into the trial if it became necessary to aid their case.  Although this Court may

have initially believed the Prosecutor's "act was inadvertent" (Tr. 4 of C), a clear reading

of the transcript indicates otherwise.  If the fingerprint card was ultimately used to

confirm Defendant's fingerprints, ( Tr.3 of B) and Marshall Henderson created such card

per his testimony, then there is no plausible reason to introduce the AIFIS testimony

except to indicate to the jury that the Defendant had a prior record.

**WHEREFORE,** the Defendant respectfully requests that this Court grant

Defendant' Motion and dismiss the Government's indictment based on the "double

Jeopardy Clause" protection.

Respectfully submitted:
**FRONT STREET LAWYERS, P.C.**

BY: _____

JOSEPH A. RATASIEWICZ, ESQUIRE
Attorney for Defendant

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

UNITED STATES OF AMERICA          :
                                  :    CR CASE NO. 06-73
          vs.                     :
                                  :
DION L. BARNARD                   :
          Defendant               :

## MOTION TO DISMISS INDICTMENT

And now, comes the Defendant, Dion L. Barnard, by and through his attorney,

Joseph A. Ratasiewicz, Esquire, and files the within Motion and avers as follows:

1.  Defendant was indicted on June 7, 2006 and charged with violating Title

21, United States Code §841.

2.  On May 12, 2008, jury selection was commenced resulting in twelve (12)

jurors and two (2) alternates to hear the case.

3.  Thereafter, trial commenced on the afternoon of May 12, 2008.

4.  On May 13, 2008, during the government's case, direct examination was

being conducted of witness U.S. Marshall Robert Henderson.

5.  During said examination, Assistant U.S. Attorney, Lesley Wolf, inquired

of witness Henderson concerning fingerprint acquisition of Defendant Barnard.

6.  Upon questioning witness Henderson, inquiry was made into the source of

the acquisition of matching the fingerprints to Defendant Barnard.

7.  Said inquiry resulted in the following exchange:

Henderson Direct

Q.  "Does this particular record list an FBI number associated with Dion Barnard?

A.  Yes. It does.

Q.  Could you please tell the jury what the number is?

A.  It's 849624WA5.

Q.  Was that number manually entered, inputted, at the time he was processed?

A.  No.

Q.  How does that number get into the record?

A.  Once we take his fingerprints it gets submitted to AIFIS, and usually within 5 to 10 minutes we get a response saying that person that was fingerprinted is whoever it is in the database. In this case he was fingerprinted and it came back to Dion Barnard with that FBI number.

Q.  If the Defendant had given you a different name, and the prints matched somebody else that you had in the system, would you have received notification of that?

A.  Yeah. It would have still come back to Dion Barnard, though, if he had been previously arrested. So it didn't matter what name he told me.

Q.  So just to be clear—did that happen here?

A.  No. When he was processed, he gave the correct information. And when it came back from AIFIS, it matched.

Q.  So it matched the person in the AIFIS system known as Dion Barnard?

A.  Right.

Q.  That person had the FBI number 849623WA5?

A.  Yes."

8.  At the conclusion of the above, objection was made by the defense which ultimately resulted in the defense being required to move for a mistrial.

9.  After the lunch break, the parties returned, at which time the Court entertained further discussions on the defense's motion for a mistrial which resulted in the Court granting said mistrial.

10.    Defendant Barnard hereby avers that the Government's conduct during

questioning of witness Henderson rose to the level of prosecutorial misconduct as said

questioning was intended to "goad" the defense into moving for a mistrial.

11.    Based upon the Government's misconduct in provoking a mistrial, a retrial

of Defendant must be barred under the "double jeopardy" grounds of the U.S.

Comstitution..

**WHEREFORE,** Defendant prays this Honorable Court dismiss the indictment

against him based upon the Double Jeopardy clause of the U.S. Constitution.

Respectfully submitted:
**FRONT STREET LAWYERS, P.C.**

BY: _____

    JOSEPH A. RATASIEWICZ, ESQUIRE
    Attorney for Defendant



## IN THE UNITED STATES DISTRICT COURT
### FOR THE DISTRICT OF DELAWARE

| UNITED STATES OF AMERICA | : | |
|---|---|---|
| | : | **CR CASE NO. 06-73** |
| vs. | : | |
| | : | |
| DION L. BARNARD | : | |
| Defendant | : | |

### O R D E R

**AND NOW,** this        day of                        , 2008, upon

consideration of the within Motion to Dismiss Indictment and after hearing thereon, it is

hereby **ORDERED** and **DECREED** that all relief therein sought is granted and the

indictment against Defendant Barnard is **DISMISSED** with prejudice.

### BY THE COURT:

_____J.

(none)

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | CR CASE NO. 06-73 |
| | : | |
| vs. | : | |
| | : | |
| DION L. BARNARD | : | |

## CERTIFICATION OF SERVICE

I, **JOSEPH A. RATASIEWICZ, ESQUIRE,** attorney for Defendant, certify

that a copy of Defendant's Motion to Dismiss Indictment was served on the following

individuals via First Class U.S. Mail Postage Prepaid on June 9, 2008; and via hand

delivery on June 9, 2008.

*Lesley Wolf, Esquire*
*U.S. Department of Justice*
*U.S. Attorney's Office,District of Delaware*
*The Nemours Bldg.*
*1007 North Market Street, Suite 700*
*P.O. Box 2046*
*Wilmington, Delaware 19899-2046*

*Honorable Gregory M. Sleet*
*U.S. District Court for State of Delaware*
*844 King Street, Room 3124*
*Wilmington, Delaware 19801*

Respectfully submitted:
FRONT STREET LAWYERS, P.C.

BY: _____
JOSEPH A. RATASIEWICZ, ESQUIRE
Attorney for Defendant

Henderson - direct

MS. WOLF:  Your Honor, the government calls

Deputy United States Marshal Robert Henderson.

3          ... ROBERT HENDERSON, having been duly sworn as

4          a witness, was examined and testified as follows ...

5                    DIRECT EXAMINATION

6    Q.    Good morning.

7          Where do you currently work?

8    A.    The United States Marshal's Service here in the

9    District of Delaware.

10   Q.    How long have you worked in the Marshal Service?

11   A.    13 years.

12   Q.    Have you been here in the District of Delaware that

13   whole time?

14   A.    Yes, I have.

15   Q.    As a Deputy United States Marshal, what are your job

16   responsibilities?

17   A.    We apprehend fugitives, protect the judiciary, witness

18   protection, asset forfeiture, and court productions.

19   Q.    Does part of your job include processing prisoners?

20   A.    Yes, it does.

21   Q.    What does it mean to process a prisoner?

22   A.    Typically just booking.  You will do fingerprints,

23   photos, bio information, that's it.

24   Q.    Do other agents and agencies bring in people that they

25   have arrested to the United States Marshals?

Henderson - direct

1    A.    They do.

2    Q.    Are those people, is that any person or people charged

3    with federal crimes?

4    A.    Federal crimes.

5    Q.    As part of the processing you mentioned

6    fingerprinting.  Is that correct?

7    A.    Yes.

8    Q.    How do the Marshals currently take fingerprints?

9    A.    We do it through a JAB system, it's a Joint Automated

10   Booking system.  It is all digitized.  It's hooked into

11   AIFIS (phonetic), which is a repository supervised by the

12   FBI.

13   Q.    AIFIS is a repository of?

14   A.    Fingerprints.

15   Q.    You said it's all computerized.  Does that mean you no

16   longer do raw fingerprints?

17         THE COURT:  Counsel, do we have a sequestration

18   order?

19         MS. WOLF:  I am sorry.  Counsel had asked that

20   he remain.  And I think he thought in the courtroom as

21   opposed to outside.  I apologize for that.

22         (Previous witness leaves courtroom.)

23   BY MS. WOLF:

24   Q.    Was there a prisoner named Dion Barnard processed by

25   the United States Marshal Service on June 16th, 2004 or

Henderson - direct

1    June 15, 2006?

2    A.    Yes.

3    Q.    And were fingerprints taken of Dion Barnard on that

4    day?

5    A.    Yes.

6                MS. WOLF:  Your Honor, may I approach the

7    witness?

8                THE COURT:  You may.

9    BY MS. WOLF:

10   Q.    Showing you what's been marked Government Exhibit 19.

11   Do you recognize that?

12   A.    Yes.

13   Q.    What is that?

14   A.    That is a JABS record of fingerprints and biographical

15   information on Dion Barnard.

16   Q.    Does it have a date that that was taken?

17   A.    Yes, it does.  June 15th, 2006.

18   Q.    Is that an accurate copy and record of that

19   fingerprint?

20   A.    Yes.

21               MS. WOLF:  Your Honor, at this time we would

22   move for the admission of Government Exhibit 19.

23               MR. RATSBANE:  Your Honor, can we see you at

24   sidebar regarding that exhibit?

25               THE COURT:  Yes.

Henderson - direct

1          (The following took place at sidebar.)

2          MR. RATASIEWICZ:  Judge, I am going to object to

3   the document.  We can't redact the middle there, where it

4   says Charges, it says, Dangerous drugs.  I don't know how

5   this guy can classify these prints as related to a dangerous

6   drug.

7          MS. WOLF:  Your Honor, he can testify how it

8   gets in, it's automatically related to the charge in which

9   he is booked in the system.

10          THE COURT:  What is the concern here?    That

11   this jury doesn't know what we are talking about?

12          MR. RATASIEWICZ:  I don't know what he is going

13   to say in regards to that.  I don't know what her next line

14   of questioning is.  I don't know what he thinks dangerous

15   drugs are.

16          THE COURT:  Is there need for this witness to

17   talk about that reference?

18          MS. WOLF:  Your Honor, he is not going to

19   discuss that reference.  (He is here to authenticate the

20   fingerprints.) We tried to get a stipulation so we didn't

21   need to call him or introduce this record.

22          THE COURT:  The objection is overruled.

23          (End of sidebar conference.)

24   BY MS. WOLF:

25   Q.    Does this particular record list an FBI number

Henderson - direct

1  associated with Dion Barnard?

2  A.    Yes, it does.

3  Q.    Could you please tell the jury what that number is?

4  A.    It's 849624WA5.

5  Q.    Was that number manually entered, inputted, at the

6  time he was processed?

7  A.    No.

8  Q.    How does that number get into the record?

9  A.    Once we take his fingerprints it gets submitted to

10  AIFIS, and usually within 5 to 10 minutes we get a response

11  back saying that person that was fingerprinted is whoever it

12  is in the database.  In this case he was fingerprinted and

13  it came back to Dion Barnard with that FBI number.

14  Q.    If the defendant had given you a different name, and

15  the prints matched somebody else that you had in the system,

16  would you have received notification of that?

17  A.    Yeah.  It would have still came back to Dion Barnard,

18  though, if he had been previously arrested.  So it didn't

19  matter what name he told me.

20  Q.    So just to be clear -- did that happen here?

21  A.    No.  When he was processed, he gave the correct

22  information.  And when it came back from AIFIS, it matched.

23  Q.    So it matched the person in the AIFIS system known as

24  Dion Barnard?

25  A.    Right.

Henderson - direct

1  Q.    That person had the FBI number 849624WA5?

2  A.    Yes.

3              MR. RATASIEWICZ:  Objection, Your Honor.  Can we

4  see you at sidebar?

5              THE COURT:  Yes.

6              (The following took place at sidebar.)

7              MR. RATASIEWICZ:  I object based on the

8  testimony of the witness indicating that there is a prior

9  arrest.

10             THE COURT:  You know, I think -- then I will let

11 Ms. Wolf respond -- that this would have been an appropriate

12 subject for a motion in limine.

13             MR. RATASIEWICZ:  We had no idea the guy was

14 going --

15             THE COURT:  You knew they were going to use

16 fingerprints.  Right?

17             MR. RATASIEWICZ:  I thought he was going to get

18 up and say these are Mr. Barnard's fingerprints and I

19 processed them, sent them on.

20             THE COURT:  The jury knows he now has a prior

21 record.

22             MS. WOLF:  Your Honor, there has been no

23 indication that it was based on a prior criminal record.

24 There are other ways prints can be put in the system.  There

25 was no testimony it was based on a prior record.  Secondly,

1   it was to avoid this situation why the government offered a

2   stipulation regarding the fingerprints.

3               THE COURT:  You know, the genie is out of the

4   bottle.  And I must say, Ms. Wolf, you have to imagine at

5   this point, this jury is bright enough to understand that --

6   I can tell you for sure that one of them is, the juror that

7   I have advised that I know -- that this gentleman has a

8   prior record.

9               MS. WOLF:  Your Honor, we gave indication last

10  week of our intent to use this in the absence of a

11  stipulation.

12              MR. CASAMENTO:  I don't know if that was

13  necessary.  I don't think it was necessary to even talk

14  about that number for him to identify the prints.  He could

15  say he took him in.  These are the prints we secured.  There

16  was a number assigned to it.  And go from there.

17              MR. RATASIEWICZ:  Whether it was necessary or

18  not, as the Judge just indicated, Your Honor, the cat is out

19  of the bag.  Now the jury is left with the understanding

20  that Mr. Barnard has a prior record.

21              THE COURT:  What is your request of the Court?

22              MR. RATASIEWICZ:  I move for a mistrial.

23              THE COURT:  We are going to take an early lunch.

24  I am going to ask counsel to do a little research.  I will

25  do a little research on my own, and see -- at this point, I

1    will hold the motion under advisement.  And we will resume

2    at 1:15.

3                    (End of sidebar conference.)

4                    THE COURT:  Ladies and gentlemen, we are going

5    to take an early lunch today.  We will resume at 1:15.  You

6    are excused until 1:15.

7                    (Recess taken.)

1

1               IN THE UNITED STATES DISTRICT COURT.

2             IN AND FOR THE DISTRICT OF DELAWARE.

3

4

    UNITED STATES OF AMERICA,    :    Criminal Action

5                      :

           Plaintiff,    :

6                      :

       v.              :

7                      :

    DION L. BARNARD,         :

8                      :

           Defendant.    :    No. 06-73-GMS

9

10                  Wilmington, Delaware

11                   May 13, 2008

                     1:21 p.m.

12               EXCERPTED TRANSCRIPT

13

14    BEFORE:  HONORABLE GREGORY M. SLEET, Chief Judge,

                          and a Jury

15

16    APPEARANCES:

17          LESLEY F. WOLF, ESQ.

          Assistant United States Attorney

18                          Counsel for Government

19          JOSEPH A. RATASIEWICZ, ESQ., and

20          NICHOLAS CASAMENTO, ESQ.

          Front Street Lawyers, P.C.

21          (Media, PA)

22                          Counsel for Defendant

23

24

25

Rx Date/Time 1:06-cr-00073-GMS FRI Document 59-4   Filed 06/20/2008   Page 2 of 20   P 009
US ATTORNEYS OFFICE   Fax:302-573-6120        Jun 13 2008  11:35    P.09

Case 1:06-cr-00073-GMS   Document 56-2   Filed 06/13/2008   Page 2 of 19

2

1              (The following is an excerpt from trial day of

2        5/13/08.)

3              THE COURT:  Please be seated.  Counsel, have you

4        had a chance to read the transcript I had prepared of the

5        Officer's testimony?

6              I can give you additional time.  You have not

7        read it yet?

8              MS. WOLF:  We just got it.

9              THE COURT:  I am going to come back in five

10       minutes, give you a chance to read it.

11              (Recess taken.)

12              Counsel, have you had an adequate opportunity to

13       read the transcript?

14              MS. WOLF:  Yes, Your Honor.

15              MR. RATASIEWICZ:  Yes.

16              THE COURT:  I will hear from you, Mr.

17       Ratasiewicz.

18              MR. RATASIEWICZ:  Your Honor, based on my

19       reading of the transcript, as well as briefly researching

20       some case law up in the law library here at the lunch break,

21       I renew my motion for mistrial.

22              THE COURT:  Do you want to be more specific in

23       the articulation of your position?

24              MR. RATASIEWICZ:  Sure.  Looking at Page 2 of

25       the transcript, where the witness indicated that, Line 11,

Rx Date/Time 1:06-cr-00073-GMS FRI Document 59-4   Filed 06/20/2008   Page 3 of 20
US ATTORNEYS OFFICE   Fax:302-573-6120                Jun 13 2008  11:35    P.10      P.010

Case 1:06-cr-00073-GMS   Document 56-2   Filed 06/13/2008   Page 3 of 19
3

1    he refers to, "AIFIS (phonetic), which is a repository

2    supervised by the FBI.

3              "Question:  AIFIS is a repository of?

4              "Answer:  Fingerprints."

5              Page 5, he references an FBI number at Line 4,

6    and then jumping down to Line 9, the answer is, "Once we

7    take his fingerprints it gets submitted to AIFIS," relating

8    back to the fingerprint repository, and usually within five

9    to ten minutes we get a response -- I am paraphrasing --

10   that the fingerprint, that the person that was fingerprinted

11   is whoever it is in the database.

12             "In this case he was fingerprinted and it came

13   back to Dion Barnard with that FBI number.

14             Question:  If were given a different name and

15   the prints matched somebody else, would you have received

16   notification?

17             "Answer:  Yes.  It still would have come back to

18   Dion Barnard, though, if he had been previously arrested.

19   So it didn't matter what name he told me."

20             "Question:  So just to be clear -- did that

21   happened here?

22             "Answer:  No.  When he was processed, he gave

23   the correct information.  When it came back from AIFIS, it

24   matched.

25             "Question:  So it matched the person in the

Rx Date/Time 1:06-cr-00073-GMS FRIDocument 59-4     Filed 06/29/2008     Page 4 of 20      P 011
US ATTORNEYS OFFICE     Fax:302-573-6120     Jun 13 2008  11:35     P. 11

Case 1:06-cr-00073-GMS     Document 56-2     Filed 06/13/2008     Page 4 of 19

. 4

1     AIFIS system known as Dion Barnard?

2                "Answer:  Right.

3                "Question:  That person had the FBI number

4     849624WA5?

5                "Answer:  Yes."

6                I objected at that point.

7                My argument is that it has prejudiced the jury

8     in the sense that the jury is now left to believe Mr.

9     Barnard has an FBI number, has fingerprints on repository

10    with the FBI, and the only way that those fingerprints would

11    be there is based on a prior arrest.

12                THE COURT:  Clearer than that, Line 17, Page 5:

13    "Yeah.  It would have still come back to Dion Barnard,

14    though, if he had been previously arrested."

15                They don't believe -- they know that he has been

16    previously arrested, don't they?

17                MR. RATASIEWICZ:  I think that's quite obvious.

18                THE COURT:  Let's hear from the government.

19                MS. WOLF:  Thank you, Your Honor.

20                The government would oppose the motion for a

21    mistrial at this point in time.  There is existing case

22    law -- I want to separate my discussion leading into the

23    question about the FBI number and repository.

24                There was a lot of discussion of the FBI number.

25    There was no objection made to that testimony leading up and

5

1    into that.

2            I should also note that counsel was provided

3    with ample notice of the government's intent to use

4    fingerprint evidence in this case, fingerprint evidence that

5    was connected through an FBI number.  There were no motions

6    made in connection with that.

7            THE COURT:  I think I pointed that out during

8    our previous sidebar.

9            MS. WOLF:  The government did actually seek a

10    stipulation regarding the authenticity of the fingerprints

11    that were used, so that they could have been introduced

12    without any issue or necessity to authenticate or connect

13    them to defendant.  That stipulation was declined.

14            THE COURT:  You are not suggesting that they

15    were obliged to stipulate.

16            MS. WOLF:  No, Your Honor.  I am not suggesting

17    that at all.

18            THE COURT:  You are not suggesting that somehow

19    they were derelict in their duty to their client, that is

20    counsel, by not stipulating, are you?

21            MS. WOLF:  No, Your Honor, absolutely not.

22    There is no requirement to stipulate.

23            But I will note that there is a Fifth Circuit

24    decision, 567 F.2d 1309, where the Fifth Circuit upheld a

25    denial of a mistrial in a case where testimony was about

Rx Date/Time Case 1:06-cr-00073-GMSFRI Document 59-4    Filed 06/20/2008    Page 6 of 20    P.013
US ATTORNEYS OFFICE    Fax:302-573-6120    Jun 13 2008 11:36    P.13

Case 1:06-cr-00073-GMS    Document 56-2    Filed 06/13/2008    Page 6 of 19

6

1   photographs which were, in fact, mug shots taken in the

2   course of a prior arrest. And in upholding the lower

3   Court's decision not to declare a mistrial, the Court of

4   Appeals cited as one of the relevant factors the failure to

5   concede or stipulate to the authenticity and the

6   government's need to lay a foundation and to introduce

7   certain evidence.

8           THE COURT: With all due respect to my brethren

9   in the Fifth Circuit, I don't think I would follow that

10  rationale, would be inclined to do that. I would be

11  surprised if the Third Circuit followed that type of

12  rationale in a case like this.

13          Were you able to find any Third Circuit,

14  published Third Circuit precedent on this?

15          MS. WOLF: Your Honor, I was unable to find any

16  Third Circuit decision, published or otherwise.

17          THE COURT: We found something unpublished. But

18  go ahead.

19          MS. WOLF: I also would cite to a decision under

20  the Fourth Circuit, which states, "The testimony of FBI

21  Agent Burke concerning an FBI number of defendant was quite

22  innocuous because no evil inference was sought from the fact

23  that Taylor did not have an FBI number. We take judicial

24  notice that substantial numbers in the population who do

25  have FBI numbers are free from crime or other bad repute.

RX Date 1-06-cr-00073-GMS Document 59-4 Filed 06/20/2008 Page 7 of 20 P. 014
US ATTORNEYS OFFICE Fax:302-573-6120 Jun 13 2008 11:36 P. 14

Case 1:06-cr-00073-GMS   Document 56-2   Filed 06/13/2008   Page 7 of 19

1    They have been exposed to the FBI" --

2         THE COURT:   Interrupting.  As you might imagine,

3    I have been making both sides of this argument during the

4    course of our break and thinking about a curative

5    instruction and wondering to myself whether an instruction

6    just along those lines might suffice -- and I will let you

7    finish, but I will interrupt from time to time -- to the

8    effect just suggested, that there are often occasions -- I,

9    myself, have an FBI number, you have an FBI number, Ms.

10   Wolf.  Ms. Kempski does.  Many involved in law enforcement

11   do.

12        But my concern is that it may or may not be

13   adequate to the task of removing the possibility that that

14   knowledge of the defendant's prior arrest might infect the

15   jury's assessment of the facts, particularly given the

16   nature of this case.

17        What I mean by that is that there is at least an

18   issue of identification, albeit we do have -- it's an

19   interesting case.  It is sort of an identification-plus

20   case, it seems to me.  What I mean by that is, certainly we

21   have an identifying witness.  But the witness is, I will use

22   the word for a lack of a better word, a corrupt source and

23   one who at least has some warts.  And certainly those warts

24   will be discussed, I am sure, during the closing comments of

25   counsel, and will be, I am sure, strongly considered by the

Case 1:06-cr-00073-GMS FRI Document 59-4   Filed 06/20/2008   Page 8 of 20   P. 015
US ATTORNEYS OFFICE   Fax:302-573-6120   Jun 13 2008  11:36   P. 15

Case 1:06-cr-00073-GMS   Document 56-2   Filed 06/13/2008   Page 8 of 19

8

1   jury.

2          So I don't want you to think that I am

3   discounting Mr. Hammond's testimony.  And there is certainly

4   other circumstantial evidence.  And this was part of it,

5   fingerprint on the bag, we haven't yet heard from the

6   expert, who I would imagine would testify in this regard.

7          So I have a concern as to whether that type of

8   instruction would be adequate to the task.

9          Let me let you finish.

10          MS. WOLF:  Your Honor, the curative instruction

11   was, in fact, what the government would propose.  We think

12   that the existence --

13          THE COURT:  Did you have one specifically in

14   mind?

15          MS. WOLF:  I took the liberty of drafting one,

16   which I will read.

17          You have heard testimony that the defendant had

18   an existing FBI number at the time of his arrest in

19   connection with this matter.  I instruct you that an FBI

20   number is just that, a number which is a record of

21   identification, much like a driver's license or Social

22   Security number.  You should not draw any inference about

23   the defendant by virtue of the fact that there is an FBI

24   number attached to defendant's fingerprints.

25          THE COURT:  Something along the lines of what I

Rx Date/Time 1:06-cr-00073-GMS FRI Document 59-4    Filed 06/20/2008    Page 9 of 20    P 016
US ATTORNEYS OFFICE    Fax:302-573-6120    Jun 13 2008  11:36    P.16

Case 1:06-cr-00073-GMS    Document 56-2    Filed 06/13/2008    Page 9 of 19

9

1    would have said.  Go ahead.  Let me let you continue with

2    your argument.

3         MS. WOLF:  I think that gets over, I think, the

4    first hurdle, the government's position would be, with

5    regard to the defendant involving the fingerprints, again,

6    that it was repeated, it was done several times without

7    objection.

8         And I think the Fourth Circuit case is sort of

9    relevant because it cites to the part where, it was

10    innocuous, it wasn't designed to elicit that defendant had a

11    number --

12         THE COURT:  I don't think there is any inference

13    here that this was intentional or any effort to prejudice

14    the defendant.

15         MS. WOLF:  Right.

16         The second portion, and I think the comment that

17    Your Honor keyed in on as perhaps being the most problematic

18    from the Court's perspective, is it still would have come

19    back to Dion Barnard, though, if he had been previously

20    arrested, so it didn't matter what name he told me.

21         Now, I think, going on, reading a little

22    further, So Just to be clear, did that happen here?  The

23    answer to that question is actually no.  And then what's

24    said, it came back, it matched.

25         So I don't think that there is actually

Rx Date/Time 06-cr-00073-GMS (FR Document 59-4   Filed 06/29/2008   Page 10 of 20
US ATTORNEYS OFFICE   Fax:302-573-6120                   Jun 13 2008  11:36    P.17    P. 017

Case 1:06-cr-00073-GMS   Document 56-2    Filed 06/13/2008   Page 10 of 19

10

```
 1    unequivocal testimony that defendant had been previously

 2    arrested.

 3            To the extent that the jury may infer or believe

 4    that, I also think that it may be possible to draft a

 5    curative instruction to that end.

 6            The government, of course, would make no further

 7    reference in closing or otherwise to the possibility that

 8    defendant had been previously arrested.

 9            Not having the transcript during the lunch

10    break, I did not have the opportunity to draft a proposed

11    curative instruction.  But there are instances where

12    inadvertently during the course of testimony witnesses

13    improperly testifying or referring to an arrest rather than

14    a conviction --

15            THE COURT:  We had one here where the witness,

16    contrary to some agreement, referred to money that was

17    seized during the course of the search.  I thought that a

18    curative instruction could be problematic, but when it was

19    proposed, gave it.  So I agree there.

20            MS. WOLF:  Your Honor, I think the curative

21    instruction could be to the effect that an arrest is --

22    first of all, can be for any number of things.  It can be

23    more -- because one of our jurors had an underage drinking

24    incident.

25            THE COURT:  That is a former juror, yes.
```

KX UATA/LTMe 1:06-cr-00073-GMS FRID Document 59-4 Filed 06/20/2008 Page 11 of 20 P. 018
US ATTORNEYS OFFICE Fax:302-573-6120 Jun 13 2008 11:36 P. 18

Case 1:06-cr-00073-GMS Document 56-2 Filed 06/13/2008 Page 11 of 19
11

1         MS. WOLF:  A former juror.  But that it does not

2    correspond, first and foremost, with conviction of any

3    crime, and that it, in fact, can be in connection with a

4    minor offense.  So there is no implication that defendant

5    was previously linked with criminal activity.

6              THE COURT:  Sort of on the other side of that --

7    and I will let Mr. Ratasiewicz make his own argument -- but

8    my concern and thought about that as well is that it's the

9    FBI.  That carries with it, for lack of a better word, a

10   certain catch.  There are certain inferences I think people

11   draw regarding severity of involvement when you have the

12   FBI, when you have the federal government, when people come

13   to this Court, you are in federal court.  You I think I

14   understand my point.

15             MS. WOLF:  I do, Your Honor.  But I believe,

16   coupled with the initial instruction explaining what an FBI

17   number is and, you know, that anyone can have, the police

18   officers have them, I believe school bus drivers, that there

19   is a wide range of people who do have FBI numbers, the

20   pairing of those two instructions would cure any prejudice.

21             THE COURT:  Let me give Mr. Ratasiewicz a chance

22   to respond.

23             Mr. Ratasiewicz, why isn't a curative

24   instruction adequate?

25             MR. RATASIEWICZ:  I don't think it is adequate,

1   Your Honor. I don't believe it could be adequate. As

2   eloquent as you are at times, I just don't believe -- and

3   you are -- but I just don't believe that it would cure this

4   defect. Up until that moment in this trial, there was

5   absolutely no evidence from the prosecution that Mr. Barnard

6   had any prior criminal dealings -- I will use that term,

7   criminal dealings -- let alone drug transactions. There has

8   been absolutely no evidence from the prosecution in that

9   regard.

10      And now, the inference given through this Page 5

11  is that he probably does have prior drug dealings. He

12  probably does have prior dealings, I will call them criminal

13  dealings. Once that is placed in the jurors' minds, so be

14  it inadvertently, that taints the jury to the point where I

15  don't know that any curative instruction is going to remedy

16  that.

17      That's my major concern with this.

18      THE COURT: Okay.

19      Let me get you to respond, briefly, if you

20  would, to Ms. Wolf's point about the two points she made,

21  the point about a stipulation, the option of stipulating,

22  thereby avoiding this type of problem, and what is clear

23  from the transcript, the belated -- well, two things, not

24  filing any motions. I talked about that at sidebar, to

25  limit this, to constrain or put limits, some guidelines on

Rx Date/Time    JUN-13-2008(FRI) 09:41    302 573 6120
US ATTORNEYS OFFICE    Fax:302-573-6120    Jun 13 2008  11:36    P. 20    P. 020

1    how this testimony would be used. And that could have

2    easily been done. And not putting an onus on the defense to

3    stipulate, I don't think that is required. But during the

4    pretrial conference we could have easily, it seems to me,

5    pursuant to a motion or request orally delivered or made,

6    put proper parameters on the use of this type of testimony,

7    at least to avoid this and waiver.

8            Why wasn't that a waiver, and your several-

9    questions-in, I will call it belated, objection? Why isn't

10    that waiver, as I think has been suggested?

11            MR. RATASIEWICZ: Can I address the second thing

12    first?

13            THE COURT: Sure.

14            MR. RATASIEWICZ: It's not a waiver because at

15    the time, on Page 2, I am referring to, when it was brought

16    in, it says an FBI repository for fingerprints -- actually,

17    it doesn't say FBI at that point -- it does. Repository

18    supervised by the FBI for fingerprints.

19            THE COURT: What line?

20            MR. RATASIEWICZ: Page 2, starts at Line 11 and

21    down. I think at that point -- and again, I didn't know

22    where she was going to go after that -- but at that point

23    there is no tie-in yet to this document, to the degree it's

24    going to be tied in on Page 5. It just says there is

25    actually a repository. The jury could have thought there

 1    could be a repository of fingerprints for everybody in the

 2    world or just people in Wilmington or people on the East

 3    Coast at that point.

 4         But then when you tie that, the AIFIS and

 5    repository, to Page 5, and where we get into the fact that

 6    clearly the implication is it can only be by a prior arrest

 7    or if he had been previously arrested, now you know that the

 8    repository exists for arrested people, or at least people --

 9    the inference is, arrested people or people that have

10    committed crimes.

11         So we didn't object on Page 2 because we really

12    didn't know where she was going to go with this.  But when

13    we get to Page 5, and she ties it in with that kind of

14    questioning and answers, that's where we raised the

15    objections.

16         So I believe it was timely under those

17    circumstances.  We had no idea where she was going to go

18    with that.

19         In regards to the first point, why we didn't

20    file a motion, again, we suspected that she was going to

21    bring the witness in, he was going to the fact that he

22    handled Mr. Barnard after this January 12th, '06 arrest, he

23    fingerprinted him on the 15th, he was going to say those are

24    the fingerprints that I digitally produced of Mr. Barnard

25    and I sent them on to wherever he sends them, lab, gave them

RX UdⒸaﾟSe 1:06-cr-00073-GMS FRIDocument 59-4   Filed 06/20/2008   Page 15 of 20   P. 022
US ATTORNEYS OFFICE   Fax:302-573-6120   Jun 13 2008  11:37   P.22

Case 1:06-cr-00073-GMS   Document 56-2   Filed 06/13/2008   Page 15 of 19

15

1    back to the detective or wherever they went.

2           And did you attach a number to it?  Yeah, that

3    number.

4           And I assume, through chain of custody, she was

5    going to say when they got to the fingerprint analysis that

6    they had the same number on them that they had, is it the

7    same number that you -- I am talking about the fingerprint

8    expert, when he comes in, I am assuming she would say is the

9    number on this fingerprint document the same number that was

10    generated by Marshal -- apologize, I forget his last name --

11    but the U.S. Marshal?  They would tie the two numbers

12    together.

13           There was no break in the chain of custody from

14    the time he took the prints until they got to the expert.

15    We were assuming that's where she was going to go.  It would

16    be short and sweet.  We wouldn't probably have had any

17    questions of this man, depending upon what he said, except

18    for the digital part.  But that's a different issue.

19           But once this happened, you know, again, I don't

20    think we needed to file a motion in that regard because it

21    seemed pretty straightforward at the time.

22           THE COURT:  Okay.  Let me hear from Ms. Wolf

23    again.

24           Ms. Wolf, what was the purpose of the

25    fingerprint evidence?

1              MS. WOLF: From Marshal Henderson?

2              THE COURT: Yes.

3              MS. WOLF: It was to connect. The fingerprints

4   that are actually used by the DEA lab are accessed, as we

5   learned in the course of preparation through trial, not

6   through a fingerprint card that's sent with an arrest, but

7   through the AIFIS system. What DEA sends is a name and an

8   FBI number. The fingerprint examiner then goes into the

9   system, pulls up existing prints, and proceeds with the

10  analysis based on that. So the government, obviously,

11  wanted to be able to connect those fingerprints to the

12  defendant Dion Barnard.

13              In the course of preparing for trial, we got the

14  current fingerprint card, and were able to provide that to

15  the fingerprint examiner, who looked at it and was able to

16  say, yes, those are the same prints that were taken from

17  Dion Barnard that were also taken -- that were existing in

18  the system. I used the same ones.

19              Unfortunately, when we were looking at the card,

20  it appeared that Deputy Marshal Henderson had been the

21  person who printed. In the course of preparation, we

22  discovered that while that was most likely the case, the way

23  the system worked was that there was a period of time where

24  the Marshal's Service was having some difficulty with

25  certain Deputy Marshals' passwords and that there was no

RX DATE 1:06-cr-00073-GMS FRIDocument 59-4      Filed 06/20/2008    Page 17 of 20    P. 024
US ATTORNEYS OFFICE      Fax:302-573-6120        Jun 13 2008  11:37       P. 24

Case 1:06-cr-00073-GMS    Document 56-2    Filed 06/13/2008    Page 17 of 19

17

1    guarantee.

2              So what we needed to do was to obtain testimony

3    about why the system worked to authenticate the prints, that

4    they in fact belonged to defendant. So it did require an

5    extra step, a step, quite frankly, we would have liked to

6    have avoided and in a perfect world would have been able to.

7    But we thought it was necessary here to ensure there was no

8    dispute about whose fingerprints were accessed and matched

9    to the print.

10             THE COURT:   Was that made known to the defense?

11             MS. WOLF:   Not in any great detail. But we let

12   them know we were going to call a witness and it was going

13   to require some additional testimony to authenticate the

14   prints.

15             With regard to ---

16             THE COURT:   Was there another purpose for the

17   prints?

18             MS. WOLF:   No.   That is the purpose of the

19   prints and of Deputy Marshal Henderson's testimony.

20             THE COURT:   Was there going to be some print

21   comparison?

22             MS. WOLF:   Yes.   Our last witness, who we intend

23   to call, is the FBI fingerprint examiner, who would testify

24   to that effect, which, Your Honor, the government obviously

25   believes is an important piece of evidence in this case.   So

18

1   we wanted to dot our i's and cross our t's with regard to

2   that evidence.  Again, we continue to believe that a

3   curative instruction is appropriate.  I think the argument

4   about the taint and undue taint may -- while I appreciate

5   the concern that it may not sort of give the respect to

6   which I think jurors give instructions and to which jurors

7   take on the responsibilities and duties when they are

8   instructed to sit and hear and render a verdict based on

9   law --

10          THE COURT:  I have been doing this a while now.

11  If anybody feels strongly about that, I do.  I think most

12  judges, we are very protective of our jurors in this regard.

13  I give them great credit for being able to follow my

14  instructions.  And they do follow my instructions.

15          They are generally very bright and able to -- in

16  the main, they get it right.  But we have got to make sure

17  that we give them a correct basis upon which to act.  And I

18  am concerned and afraid in this case that there has -- and I

19  believe, quite frankly, it was inadvertent, that the

20  government has inadvertently tainted that ability through

21  the testimony of this witness to enable this jury to do

22  that.

23          So I am going to act out of an abundance of

24  caution and grant the motion in this case for a mistrial.

25          I will leave it to counsel to -- the government

1   has some decisions to make as to how it wants to proceed, a

2   decision to make as to how it wants to proceed. And the

3   defense will have to figure out how it wants to respond to

4   that decision.

5                   MS. WOLF:   Is that a mistrial without prejudice?

6                   THE COURT:   That is a mistrial without

7   prejudice.   I would offer to the parties the opportunity to

8   brief the whole issue of whether a retrial should be

9   permitted.   I would imagine, the high quality of the

10  lawyering that's been done by both sides, I should expect

11  that I am going to be, should expect to be getting a motion

12  of some sort seeking to preclude a trial.   But I would ask

13  that once you communicate with one another, that you then

14  see if you can agree on a briefing schedule, submit that

15  schedule to the Court for my approval.   And I will make a

16  decision.   Okay?

17                  MS. WOLF:   Thank you, Your Honor.

18                  THE COURT:   Mistrial is granted.

19                  MR. RATASIEWICZ:   Thank you, Your Honor.

20                  THE COURT:   We are in recess.   And I will

21  dismiss the jury on my own.

22                          (Court recessed at 1:55 p.m.)

23                                  -   -   -

24  Reporter:   Kevin Maurer

25

## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | **CR CASE NO. 06-73** |
| | : | |
| **vs.** | : | |
| | : | |
| **DION L. BARNARD** | : | |

### CERTIFICATION OF SERVICE

I, **JOSEPH A. RATASIEWICZ, ESQUIRE,** attorney for Defendant, certify

that a copy of Defendant's Memorandum of Law in Support of Motion to Dismiss

Indictment and accompanying documents was served on the following via Hand Delivery

on June 20, 2008.

> *Lesley Wolf, Esquire*
> *U.S. Department of Justice*
> *U.S. Attorney's Office,District of Delaware*
> *The Nemours Bldg.*
> *1007 Orange Street, Suite 700*
> *P.O. Box 2046*
> *Wilmington, Delaware 19899-2046*

> *Honorable Gregory M. Sleet*
> *U.S. District Court for State of Delaware*
> *844 King Street, Room 3124*
> *Wilmington, Delaware 19801*

> Respectfully submitted:
> **FRONT STREET LAWYERS, P.C.**

BY: _____
      JOSEPH A. RATASIEWICZ, ESQUIRE
      Attorney for Defendant

Date: _6/20/08_