## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| UNITED STATES OF AMERICA, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) Criminal Action No.  06-73-GMS |
| | ) |
| DION L. BARNARD, | ) |
| | ) |
| Defendant. | ) |

### GOVERNMENT'S OPPOSITION TO MOTION TO DISMISS INDICTMENT

On June 9, 2008, following the Court's declaration of a mistrial without prejudice on May 13, 2008, defendant Dion Barnard filed a Motion to Dismiss the Indictment.  (D.I. 55.)  The government filed an opposition on June 13, 2008.  (D.I. 56.)  Following a conference with the Court, the defendant submitted a Memorandum of Law in support of that motion.  (D.I. 59.) Because the defendant has failed to meet his burden to demonstrate that the government intended to goad the defendant into moving for a mistrial, his motion should be denied.

### I.    Legal Standard

Where a defendant moves for a mistrial, he may generally not claim that the Double Jeopardy Clause bars retrial.  See United States v. Jorn, 400 U.S. 470, 485 (1971).  However, a narrow exception exists permitting a defendant to raise such a claim "only where the government conduct in question is intended to 'goad' the defendant into moving for a mistrial."  Oregon v. Kennedy, 456 U.S. 667, 676 (1982).  "Prosecutorial conduct that might be viewed as harassment or overreaching, even if sufficient to justify a mistrial on defendant's motion ... does not bar retrial absent intent on the part of the prosecutor to subvert the protections afforded by the Double Jeopardy clause."  Id. at 675-76.

Therefore, in seeking to bar retrial, the defendant bears the heavy burden of demonstrating that the prosecutor had the subjective intent to cause the defendant to move for a mistrial.  Id.; see also United States v. Williams, 472 F.3d 81 (3d Cir. 2007) (reversing district court's dismissal of indictment where defendant failed to show subjective intent of prosecutor to cause mistrial); United States v. Dinzey, 259 Fed. Appx. 509, 2007 WL 4455385 (3d Cir. Dec. 20, 2007) (affirming denial of motion to dismiss where defendant failed to present evidence of intent to cause mistrial).  Although the Supreme Court in Kennedy did not set forth specific factors to guide a court's inquiry, lower courts have considered three factors to be of particular significance in analyzing a motion to dismiss the indictment after a mistrial has been granted: (1) if the prosecutor had reason to think a defendant might be acquitted; (2) if the government might gain from a mistrial; and (3) if the prosecutor offered a "plausible justification" for the actions that led to the mistrial.  United States v. Archibald, 2003 WL 561096 at *5 (E.D. Pa. Feb. 26, 2003) citing United States v. Curtis, 683 F.2d 769, 777-78 (3d Cir. 1982).[1]  Review of each of the factors here demonstrates that the defendant has not satisfied his burden to prove the prosecutor's bad faith.

**II.    The Defendant Cannot Demonstrate the Prosecutor's Subjective Intent Was to Goad Him to Move for a Mistrial.**

**A.    The Government Had No Reason to Believe the Jury Might Acquit.**

There was no incentive for the government to seek a mistrial under the facts of the trial. In support of his motion, the defendant makes two arguments, neither of which is supported by the record.  First, the defendant argues generally that the credibility of a government witness,

---

[1]Courts may also consider the persistent nature of any misconduct prejudicial to defendant in evaluating a motion to dismiss.  See Archibald, 2003 WL 561096 at *6 n.7.

T.H., was called into question. This assertion, however, does not withstand scrutiny. T.H. served as a confidential source for the government, and going into the trial, the government was well aware that defendant would attempt to impeach his credibility. The defendant does not cite to, nor does the record contain, any "surprise" testimony or statement damaging to the government's case. See Curtis, 683 F.2d at 777. Any issues highlighted by the defendant during the cross-examination of T.H. were expected.

Moreover, there was no incentive for the government to seek a mistrial because T.H.'s flaws as a witness would not be diminished in a subsequent trial. See Williams, 472 F.3d at 88 (reversing decision to dismiss indictment following mistrial no objective reason to think that trial going badly or that government might uncover new evidence to assist in retrial).

Second, the defendant asserts that following Special Agent Miller's testimony, the jury might have doubted the veracity of the government's audio transcripts of the drug buy charged in the indictment. This argument is flawed not only because the defendant fails to identify with any specificity how he impeached the accuracy of the transcripts, but also because the transcripts themselves were not admitted into evidence— the actual audio was. While the government maintains the transcripts are accurate representations, during deliberations, the jury would have had access only to the tape recording itself. The instant case is not like Archibald, 2003 WL 561096 at *5, where the court's repeated admonishment to government regarding inconsistent testimony, omissions, and contradictions of witnesses' testimony on key issues could have created the perception that the government's case was going poorly.[2]

---

[2]The defendant's reliance on the Court's statement during the colloquy on the motion for mistrial is also misguided. These comments could not have influenced the subjective intent of the prosecutor because they were made *after* defendant's motion for mistrial. Moreover, the

The defendant's proffered reasons to believe that the prosecutor might think that defendant would be acquitted are baseless. Although witnesses had been cross-examined, no significant evidence had been excluded and there is no evidence of any unexpected revelations harmful to the government's case-in-chief. See id. (denying motion to dismiss, in part, because record devoid of evidence of the government's perception that case going poorly); see also United States v. Wharton, 320 F.3d 526, 532 (5th Cir. 2003) (defendant's argument case going poorly for prosecution unpersuasive where court excluded some damaging testimony but admitted other damaging testimony).

**B.     There Is No Evidence of Advantages to the Government of Retrial.**

The defendant has presented no evidence that the government stood to gain by retrying the case. As discussed above, the case-in-chief proceeded as expected. The government presented four witnesses without a surprise. There were no novel issues raised by the defense— whatever the prosecution may have "gleaned," (Def. Mem. at 4), from the defendant's cross-examination of its witnesses was consistent with expectations. Retrial of the matter would not, as the defendant argues, enable the government to "clean up" its case— it could not change T.H.'s background, nor could it alter the audio recordings offered into evidence. (Def. Mem. at 4.) Moreover, retrial requires the government to reinvest the time and resources in preparing a

---

substance of these comments does not corroborate defendant's statement that the case was going so poorly the government had an incentive to goad defendant into moving for a mistrial. While the Court commented that T.H. had "some warts" (Col. Tr. 7), the Court also refused to "discount" his testimony. (Col. Tr. 8) Further, the Court noted that the government had presented other circumstantial evidence and had yet to present a key piece of corroborative evidence— defendant's fingerprints on the packaging of the cocaine base sold to T.H. (Col. Tr. 7-8.)

second time for trial.  See Curtis, 683 F.2d at 777 (no evidence showing government hoped it

might uncover new evidence or otherwise benefit from new trial); Archibald, 2003 WL 561096

at *6 (noting costs to government and benefits to defendant of second trial).  The defendant has

failed to identify legitimate and specific gains for the government in trying its case a second

time.  Consideration of the second factor does not support the defendant's motion to dismiss.

### C.    The Line of Questioning That Inadvertently Led to a Mistrial Was Justifiable.

Where a defendant argues that double-jeopardy acts as a bar to retrial, the defendant must

show, with objective evidence, that it was the subjective intent of the prosecutor to cause a

mistrial.[3]  See Williams, 472 F.3d at 88.  Accordingly, the defendant's motion should fail

because the government offered a plausible evidentiary explanation for the line of questioning

that led to the mistrial.  During argument on the motion for mistrial, the Court specifically

questioned the prosecutor as to the purpose of the fingerprint evidence about which Deputy

Marshal Henderson was testifying.  (Col. Tr. 15.)[4]  In response, the prosecutor explained that the

testimony was necessary to connect defendant with the fingerprints that were matched to the

latent prints taken from the packaging of cocaine base.  In this case, there was no witness who

could testify that he actually fingerprinted the defendant.  Therefore, the government needed to

elicit testimony about the way the system worked, and that the system actually authenticated the

prints as belonging to a certain person, in the instant case, the defendant.  (Col. Tr. 16-17.)

---

[3]The defendant fails to offer any objective evidence that the government intended to cause defendant to move for a mistrial.  See, e.g., Archibald, 2003 WL 561096 at *6 (even a finding of prosecution's "indifference" to motion for mistrial insufficient to support motion to dismiss, actual intent must be "definitively proven").

[4]The transcript of the Court's colloquy on the Motion for Mistrial is attached hereto as Exhibit 1.

The defendant relies, in large part, on the entire line of questioning concerning the fingerprints in attempting to create an inference of intent to goad the defendant into making his motion. His argument, however, rests upon a false premise. The defendant states that the government need only have elicited testimony from Deputy Marshal Henderson that he took the fingerprints of defendant at a specific date and time and that a number was associated with those fingerprints. (Def. Mem. at 5.) However, as the prosecutor explained to the Court, Deputy Marshal Henderson did not recall taking the defendant's fingerprints, nor could he rely solely on the use of his login, and therefore needed to explain the process and system of fingerprint validation. (Col. Tr. 16-17.) The government made the defendant aware, prior to trial, of its need to authenticate the fingerprints through the associated FBI number. Indeed, as explained to the Court, the government requested that the defendant stipulate that the fingerprint exemplar matched to the latent print evidence belonged to him, in part to avoid any unfair prejudice to the defendant. (Col. Tr. 5.)

While the defendant had no obligation to so stipulate— and indeed did not do so— his counsel was made aware of the government's intent to use defendant's FBI number to authenticate the fingerprints. The government complied with its discovery obligations and provided defendant's counsel with a tabbed copy of all exhibits the government intended to introduce at trial.[5] The defendant made no objection to the use of the FBI number to either the government or the Court until such time as he moved for a mistrial.[6] This record supports the

---

[5]The government did not fail, as the defendant implies, in its obligations to disclose discoverable information with the goal of later sabotaging defendant.

[6]Any reference to a possible prior *arrest* was made solely by the witness and was not desired by or expected by the prosecutor.

justification offered by the government and precludes the strained argument made by the defendant. See Williams, 472 F.3d at 86 (citing prosecutor's explanation offered at hearing on motion to dismiss as relevant factor in permitting retrial); Curtis, 683 F.2d at 777 (noting that "prosecutor at least proffered some justification for his remarks" in reversing dismissal of indictment); United States v. Neufeld, 949 F. Supp. 555, 560-61 (S.D. Ohio 1996) (denying motion to dismiss where prosecutor's explanation credible and consistent with a legitimate subjective intent). The prosecutor did not knowingly persist in a verboten line of questioning with the goal of prejudicing the defendant, but instead in a line of questioning believed to be legitimate and designed to preclude any argument that the fingerprint sample belonged to someone other than the defendant— an argument intimated to the jury in defendant's opening statement where the defendant's counsel cautioned the jury to "Wait until [they] hear the entire story regarding the fingerprints."

Moreover, the government's vigorous opposition to defendant's motion for mistrial and its proposal of an alternative remedy undercuts any argument that it was the government's wish to cause a mistrial. See, e.g., Dinzey, 2007 WL 4455385 at *1 (noting government's opposition to motion for mistrial in affirming retrial); Wharton, 320 F.3d at 532 (no goading where "prosecution opposed mistrial in every instance"); United States v. Valadez-Camarena, 194 F.3d 1321 (10th Cir. 1999) (affirming district court's denial of motion to dismiss where prosecutor opposed mistrial motion and suggested other remedies). The government presented to the Court a proposed curative instruction and argued declaration of a mistrial was unnecessary. (Col. Tr. 8, 17-18.) These attempts to avoid a mistrial are simply inconsistent with an intent and desire to cause a mistrial.

Indeed, the Court has already determined that the conduct of the prosecutor was not intentionally designed to "goad" the defendant into moving for a mistrial.  During the colloquy on the motion for a mistrial the Court stated, "I don't think there is any inference here that this was intentional or any effort to prejudice the defendant."  (Col. Tr. 9.)  After hearing argument from the parties and the same plausible justification offered by the government, the Court reiterated its belief that the conduct was designed to deprive defendant of his Constitutional rights and stated, "I believe, quite frankly, it was inadvertent."  (Col. Tr. 18.)  Although the Court permitted the defendant an opportunity to brief the issue, the mistrial was granted without prejudice to the government's right to retry the case.  (Col. Tr. 19.)  The defendant has offered no legally sufficient reason or evidence to alter that conclusion.  The defendant has failed to meet his burden because he cannot— the record is devoid of evidence in support of his Motion to Dismiss the Indictment.  Because he cannot meet his burden of showing that the prosecution intended to "'goad' the defendant into moving for a mistrial," his motion should be denied. Kennedy, 456 U.S. at 676.

WHEREFORE, the United States respectfully requests that the Court deny Defendant's

Motion to Dismiss the Indictment and schedule the retrial of this matter.


Respectfully submitted,


COLM F. CONNOLLY
United States Attorney


BY:____s/Lesley F. Wolf_____
Lesley F. Wolf
Assistant United States Attorney


Dated: June 26, 2008

# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF DELAWARE

|  |  |  |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Criminal Action No.  06-73-GMS |
| | ) | |
| DION L. BARNARD, | ) | |
| | ) | |
| Defendant. | ) | |

## <u>CERTIFICATE OF SERVICE</u>

I, Lesley F. Wolf, hereby certify that on the 26th day of June, 2008, I caused to be filed the Government's Opposition to Motion to Dismiss Indictment with the Clerk of Court via CM/ECF.  I further certify that a copy of the foregoing was sent, via First Class Mail postage  to counsel of record as follows:

Joseph A. Ratasiewicz, Esq.
Front Street Lawyers
2 W. Baltimore Avenue, Suite 320
Media, PA 19063

<u>s/Lesley F. Wolf</u>

1            IN THE UNITED STATES DISTRICT COURT.

2            IN AND FOR THE DISTRICT OF DELAWARE.

3

4                          -   -   -

UNITED STATES OF AMERICA,        :       Criminal Action

5                                        :

                 Plaintiff,             :

6                                        :

        v.                              :

7                                        :

DION L. BARNARD,                        :

8                                        :

                 Defendant.             :       No. 06-73-GMS

9                          -   -   -

10

                        Wilmington, Delaware

11                        May 13, 2008

                          1:21 p.m.

12                     EXCERPTED TRANSCRIPT

13                          -   -   -

14   BEFORE:   HONORABLE GREGORY M. SLEET, Chief Judge,

                                   and a Jury

15

16   APPEARANCES:

17            LESLEY F. WOLF, ESQ.

              Assistant United States Attorney

18

                                Counsel for Government

19

              JOSEPH A. RATASIEWICZ, ESQ., and

20            NICHOLAS CASAMENTO, ESQ.

              Front Street Lawyers, P.C.

21            (Media, PA)

22                                Counsel for Defendant

23

24

25

1              (The following is an excerpt from trial day of

2       5/13/08.)

3              THE COURT:  Please be seated.  Counsel, have you

4       had a chance to read the transcript I had prepared of the

5       Officer's testimony?

6              I can give you additional time.  You have not

7       read it yet?

8              MS. WOLF:  We just got it.

9              THE COURT:  I am going to come back in five

10      minutes, give you a chance to read it.

11              (Recess taken.)

12              Counsel, have you had an adequate opportunity to

13      read the transcript?

14              MS. WOLF:  Yes, Your Honor.

15              MR. RATASIEWICZ:  Yes.

16              THE COURT:  I will hear from you, Mr.

17      Ratasiewicz.

18              MR. RATASIEWICZ:  Your Honor, based on my

19      reading of the transcript, as well as briefly researching

20      some case law up in the law library here at the lunch break,

21      I renew my motion for mistrial.

22              THE COURT:  Do you want to be more specific in

23      the articulation of your position?

24              MR. RATASIEWICZ:  Sure.  Looking at Page 2 of

25      the transcript, where the witness indicated that, Line 11,

1    he refers to, "AIFIS (phonetic), which is a repository

2    supervised by the FBI.

3                "Question:  AIFIS is a repository of?

4                "Answer:  Fingerprints."

5                Page 5, he references an FBI number at Line 4,

6    and then jumping down to Line 9, the answer is, "Once we

7    take his fingerprints it gets submitted to AIFIS," relating

8    back to the fingerprint repository, and usually within five

9    to ten minutes we get a response -- I am paraphrasing --

10   that the fingerprint, that the person that was fingerprinted

11   is whoever it is in the database.

12               "In this case he was fingerprinted and it came

13   back to Dion Barnard with that FBI number.

14               Question:  If were given a different name and

15   the prints matched somebody else, would you have received

16   notification?

17               "Answer:  Yes.  It still would have come back to

18   Dion Barnard, though, if he had been previously arrested.

19   So it didn't matter what name he told me."

20               "Question:  So just to be clear -- did that

21   happened here?

22               "Answer:  No.  When he was processed, he gave

23   the correct information.  When it came back from AIFIS, it

24   matched.

25               "Question:  So it matched the person in the

1    AIFIS system known as Dion Barnard?

2                 "Answer:  Right.

3                 "Question:  That person had the FBI number

4    849624WA5?

5                 "Answer:  Yes."

6                 I objected at that point.

7                 My argument is that it has prejudiced the jury

8    in the sense that the jury is now left to believe Mr.

9    Barnard has an FBI number, has fingerprints on repository

10   with the FBI, and the only way that those fingerprints would

11   be there is based on a prior arrest.

12                THE COURT:  Clearer than that, Line 17, Page 5:

13   "Yeah.  It would have still come back to Dion Barnard,

14   though, if he had been previously arrested."

15                They don't believe -- they know that he has been

16   previously arrested, don't they?

17                MR. RATASIEWICZ:  I think that's quite obvious.

18                THE COURT:  Let's hear from the government.

19                MS. WOLF:  Thank you, Your Honor.

20                The government would oppose the motion for a

21   mistrial at this point in time.  There is existing case

22   law -- I want to separate my discussion leading into the

23   question about the FBI number and repository.

24                There was a lot of discussion of the FBI number.

25   There was no objection made to that testimony leading up and

1    into that.

2         I should also note that counsel was provided

3    with ample notice of the government's intent to use

4    fingerprint evidence in this case, fingerprint evidence that

5    was connected through an FBI number.  There were no motions

6    made in connection with that.

7         THE COURT:  I think I pointed that out during

8    our previous sidebar.

9         MS. WOLF:  The government did actually seek a

10   stipulation regarding the authenticity of the fingerprints

11   that were used, so that they could have been introduced

12   without any issue or necessity to authenticate or connect

13   them to defendant.  That stipulation was declined.

14        THE COURT:  You are not suggesting that they

15   were obliged to stipulate.

16        MS. WOLF:  No, Your Honor.  I am not suggesting

17   that at all.

18        THE COURT:  You are not suggesting that somehow

19   they were derelict in their duty to their client, that is

20   counsel, by not stipulating, are you?

21        MS. WOLF:  No, Your Honor, absolutely not.

22   There is no requirement to stipulate.

23        But I will note that there is a Fifth Circuit

24   decision, 567 F.2d 1309, where the Fifth Circuit upheld a

25   denial of a mistrial in a case where testimony was about

1    photographs which were, in fact, mug shots taken in the

2    course of a prior arrest.  And in upholding the lower

3    Court's decision not to declare a mistrial, the Court of

4    Appeals cited as one of the relevant factors the failure to

5    concede or stipulate to the authenticity and the

6    government's need to lay a foundation and to introduce

7    certain evidence.

8              THE COURT:  With all due respect to my brethren

9    in the Fifth Circuit, I don't think I would follow that

10   rationale, would be inclined to do that.  I would be

11   surprised if the Third Circuit followed that type of

12   rationale in a case like this.

13             Were you able to find any Third Circuit,

14   published Third Circuit precedent on this?

15             MS. WOLF:  Your Honor, I was unable to find any

16   Third Circuit decision, published or otherwise.

17             THE COURT:  We found something unpublished.  But

18   go ahead.

19             MS. WOLF:  I also would cite to a decision under

20   the Fourth Circuit, which states, "The testimony of FBI

21   Agent Burke concerning an FBI number of defendant was quite

22   innocuous because no evil inference was sought from the fact

23   that Taylor did not have an FBI number.  We take judicial

24   notice that substantial numbers in the population who do

25   have FBI numbers are free from crime or other bad repute.

1   They have been exposed to the FBI" --

2               THE COURT:   Interrupting.   As you might imagine,

3   I have been making both sides of this argument during the

4   course of our break and thinking about a curative

5   instruction and wondering to myself whether an instruction

6   just along those lines might suffice -- and I will let you

7   finish, but I will interrupt from time to time -- to the

8   effect just suggested, that there are often occasions -- I,

9   myself, have an FBI number, you have an FBI number, Ms.

10  Wolf.   Ms. Kempski does.   Many involved in law enforcement

11  do.

12               But my concern is that it may or may not be

13  adequate to the task of removing the possibility that that

14  knowledge of the defendant's prior arrest might infect the

15  jury's assessment of the facts, particularly given the

16  nature of this case.

17               What I mean by that is that there is at least an

18  issue of identification, albeit we do have -- it's an

19  interesting case.   It is sort of an identification-plus

20  case, it seems to me.   What I mean by that is, certainly we

21  have an identifying witness.   But the witness is, I will use

22  the word for a lack of a better word, a corrupt source and

23  one who at least has some warts.   And certainly those warts

24  will be discussed, I am sure, during the closing comments of

25  counsel, and will be, I am sure, strongly considered by the

1    jury.

2    So I don't want you to think that I am

3    discounting Mr. Hammond's testimony.  And there is certainly

4    other circumstantial evidence.  And this was part of it,

5    fingerprint on the bag, we haven't yet heard from the

6    expert, who I would imagine would testify in this regard.

7    So I have a concern as to whether that type of

8    instruction would be adequate to the task.

9    Let me let you finish.

10    MS. WOLF:  Your Honor, the curative instruction

11    was, in fact, what the government would propose.  We think

12    that the existence --

13    THE COURT:  Did you have one specifically in

14    mind?

15    MS. WOLF:  I took the liberty of drafting one,

16    which I will read.

17    You have heard testimony that the defendant had

18    an existing FBI number at the time of his arrest in

19    connection with this matter.  I instruct you that an FBI

20    number is just that, a number which is a record of

21    identification, much like a driver's license or Social

22    Security number.  You should not draw any inference about

23    the defendant by virtue of the fact that there is an FBI

24    number attached to defendant's fingerprints.

25    THE COURT:  Something along the lines of what I

1  would have said.  Go ahead.  Let me let you continue with

2  your argument.

3           MS. WOLF:  I think that gets over, I think, the

4  first hurdle, the government's position would be, with

5  regard to the defendant involving the fingerprints, again,

6  that it was repeated, it was done several times without

7  objection.

8           And I think the Fourth Circuit case is sort of

9  relevant because it cites to the part where, it was

10 innocuous, it wasn't designed to elicit that defendant had a

11 number --

12          THE COURT:  I don't think there is any inference

13 here that this was intentional or any effort to prejudice

14 the defendant.

15          MS. WOLF:  Right.

16          The second portion, and I think the comment that

17 Your Honor keyed in on as perhaps being the most problematic

18 from the Court's perspective, is it still would have come

19 back to Dion Barnard, though, if he had been previously

20 arrested, so it didn't matter what name he told me.

21          Now, I think, going on, reading a little

22 further, So Just to be clear, did that happen here?  The

23 answer to that question is actually no.  And then what's

24 said, it came back, it matched.

25          So I don't think that there is actually

1    unequivocal testimony that defendant had been previously

2    arrested.

3               To the extent that the jury may infer or believe

4    that, I also think that it may be possible to draft a

5    curative instruction to that end.

6               The government, of course, would make no further

7    reference in closing or otherwise to the possibility that

8    defendant had been previously arrested.

9               Not having the transcript during the lunch

10   break, I did not have the opportunity to draft a proposed

11   curative instruction.  But there are instances where

12   inadvertently during the course of testimony witnesses

13   improperly testifying or referring to an arrest rather than

14   a conviction --

15               THE COURT:  We had one here where the witness,

16   contrary to some agreement, referred to money that was

17   seized during the course of the search.  I thought that a

18   curative instruction could be problematic, but when it was

19   proposed, gave it.  So I agree there.

20               MS. WOLF:  Your Honor, I think the curative

21   instruction could be to the effect that an arrest is --

22   first of all, can be for any number of things.  It can be

23   more -- because one of our jurors had an underage drinking

24   incident.

25               THE COURT:  That is a former juror, yes.

1          MS. WOLF:  A former juror.  But that it does not

2   correspond, first and foremost, with conviction of any

3   crime, and that it, in fact, can be in connection with a

4   minor offense.  So there is no implication that defendant

5   was previously linked with criminal activity.

6          THE COURT:  Sort of on the other side of that --

7   and I will let Mr. Ratasiewicz make his own argument -- but

8   my concern and thought about that as well is that it's the

9   FBI.  That carries with it, for lack of a better word, a

10  certain catch.  There are certain inferences I think people

11  draw regarding severity of involvement when you have the

12  FBI, when you have the federal government, when people come

13  to this Court, you are in federal court.  You I think

14  understand my point.

15         MS. WOLF:  I do, Your Honor.  But I believe,

16  coupled with the initial instruction explaining what an FBI

17  number is and, you know, that anyone can have, the police

18  officers have them, I believe school bus drivers, that there

19  is a wide range of people who do have FBI numbers, the

20  pairing of those two instructions would cure any prejudice.

21         THE COURT:  Let me give Mr. Ratasiewicz a chance

22  to respond.

23         Mr. Ratasiewicz, why isn't a curative

24  instruction adequate?

25         MR. RATASIEWICZ:  I don't think it is adequate,

1   Your Honor.  I don't believe it could be adequate.  As

2   eloquent as you are at times, I just don't believe -- and

3   you are -- but I just don't believe that it would cure this

4   defect.  Up until that moment in this trial, there was

5   absolutely no evidence from the prosecution that Mr. Barnard

6   had any prior criminal dealings -- I will use that term,

7   criminal dealings -- let alone drug transactions.  There has

8   been absolutely no evidence from the prosecution in that

9   regard.

10          And now, the inference given through this Page 5

11   is that he probably does have prior drug dealings.  He

12   probably does have prior dealings, I will call them criminal

13   dealings.  Once that is placed in the jurors' minds, so be

14   it inadvertently, that taints the jury to the point where I

15   don't know that any curative instruction is going to remedy

16   that.

17          That's my major concern with this.

18          THE COURT:  Okay.

19          Let me get you to respond, briefly, if you

20   would, to Ms. Wolf's point about the two points she made,

21   the point about a stipulation, the option of stipulating,

22   thereby avoiding this type of problem, and what is clear

23   from the transcript, the belated -- well, two things, not

24   filing any motions.  I talked about that at sidebar, to

25   limit this, to constrain or put limits, some guidelines on

1   how this testimony would be used.  And that could have

2   easily been done.  And not putting an onus on the defense to

3   stipulate, I don't think that is required.  But during the

4   pretrial conference we could have easily, it seems to me,

5   pursuant to a motion or request orally delivered or made,

6   put proper parameters on the use of this type of testimony,

7   at least to avoid this and waiver.

8           Why wasn't that a waiver, and your several-

9   questions-in, I will call it belated, objection?  Why isn't

10  that waiver, as I think has been suggested?

11          MR. RATASIEWICZ:  Can I address the second thing

12  first?

13          THE COURT:  Sure.

14          MR. RATASIEWICZ:  It's not a waiver because at

15  the time, on Page 2, I am referring to, when it was brought

16  in, it says an FBI repository for fingerprints -- actually,

17  it doesn't say FBI at that point -- it does.  Repository

18  supervised by the FBI for fingerprints.

19          THE COURT:  What line?

20          MR. RATASIEWICZ:  Page 2, starts at Line 11 and

21  down.  I think at that point -- and again, I didn't know

22  where she was going to go after that -- but at that point

23  there is no tie-in yet to this document, to the degree it's

24  going to be tied in on Page 5.  It just says there is

25  actually a repository.  The jury could have thought there

1    could be a repository of fingerprints for everybody in the

2    world or just people in Wilmington or people on the East

3    Coast at that point.

4            But then when you tie that, the AIFIS and

5    repository, to Page 5, and where we get into the fact that

6    clearly the implication is it can only be by a prior arrest

7    or if he had been previously arrested, now you know that the

8    repository exists for arrested people, or at least people --

9    the inference is, arrested people or people that have

10   committed crimes.

11           So we didn't object on Page 2 because we really

12   didn't know where she was going to go with this.  But when

13   we get to Page 5, and she ties it in with that kind of

14   questioning and answers, that's where we raised the

15   objections.

16           So I believe it was timely under those

17   circumstances.  We had no idea where she was going to go

18   with that.

19           In regards to the first point, why we didn't

20   file a motion, again, we suspected that she was going to

21   bring the witness in, he was going to the fact that he

22   handled Mr. Barnard after this January 12th, '06 arrest, he

23   fingerprinted him on the 15th, he was going to say those are

24   the fingerprints that I digitally produced of Mr. Barnard

25   and I sent them on to wherever he sends them, lab, gave them

1   back to the detective or wherever they went.

2           And did you attach a number to it?  Yeah, that

3   number.

4           And I assume, through chain of custody, she was

5   going to say when they got to the fingerprint analysis that

6   they had the same number on them that they had, is it the

7   same number that you -- I am talking about the fingerprint

8   expert, when he comes in, I am assuming she would say is the

9   number on this fingerprint document the same number that was

10  generated by Marshal -- apologize, I forget his last name --

11  but the U.S. Marshal?  They would tie the two numbers

12  together.

13          There was no break in the chain of custody from

14  the time he took the prints until they got to the expert.

15  We were assuming that's where she was going to go.  It would

16  be short and sweet.  We wouldn't probably have had any

17  questions of this man, depending upon what he said, except

18  for the digital part.  But that's a different issue.

19          But once this happened, you know, again, I don't

20  think we needed to file a motion in that regard because it

21  seemed pretty straightforward at the time.

22          THE COURT:  Okay.  Let me hear from Ms. Wolf

23  again.

24          Ms. Wolf, what was the purpose of the

25  fingerprint evidence?

1          MS. WOLF:  From Marshal Henderson?

2          THE COURT:  Yes.

3          MS. WOLF:  It was to connect.  The fingerprints

4    that are actually used by the DEA lab are accessed, as we

5    learned in the course of preparation through trial, not

6    through a fingerprint card that's sent with an arrest, but

7    through the AIFIS system.  What DEA sends is a name and an

8    FBI number.  The fingerprint examiner then goes into the

9    system, pulls up existing prints, and proceeds with the

10   analysis based on that.  So the government, obviously,

11   wanted to be able to connect those fingerprints to the

12   defendant Dion Barnard.

13          In the course of preparing for trial, we got the

14   current fingerprint card, and were able to provide that to

15   the fingerprint examiner, who looked at it and was able to

16   say, yes, those are the same prints that were taken from

17   Dion Barnard that were also taken -- that were existing in

18   the system.  I used the same ones.

19          Unfortunately, when we were looking at the card,

20   it appeared that Deputy Marshal Henderson had been the

21   person who printed.  In the course of preparation, we

22   discovered that while that was most likely the case, the way

23   the system worked was that there was a period of time where

24   the Marshal's Service was having some difficulty with

25   certain Deputy Marshals' passwords and that there was no

1    guarantee.

2              So what we needed to do was to obtain testimony

3    about why the system worked to authenticate the prints, that

4    they in fact belonged to defendant.  So it did require an

5    extra step, a step, quite frankly, we would have liked to

6    have avoided and in a perfect world would have been able to.

7    But we thought it was necessary here to ensure there was no

8    dispute about whose fingerprints were accessed and matched

9    to the print.

10             THE COURT:  Was that made known to the defense?

11             MS. WOLF:  Not in any great detail.  But we let

12   them know we were going to call a witness and it was going

13   to require some additional testimony to authenticate the

14   prints.

15             With regard to ---

16             THE COURT:  Was there another purpose for the

17   prints?

18             MS. WOLF:  No.  That is the purpose of the

19   prints and of Deputy Marshal Henderson's testimony.

20             THE COURT:  Was there going to be some print

21   comparison?

22             MS. WOLF:  Yes.  Our last witness, who we intend

23   to call, is the FBI fingerprint examiner, who would testify

24   to that effect, which, Your Honor, the government obviously

25   believes is an important piece of evidence in this case.  So

1   we wanted to dot our i's and cross our t's with regard to

2   that evidence.  Again, we continue to believe that a

3   curative instruction is appropriate.  I think the argument

4   about the taint and undue taint may -- while I appreciate

5   the concern that it may not sort of give the respect to

6   which I think jurors give instructions and to which jurors

7   take on the responsibilities and duties when they are

8   instructed to sit and hear and render a verdict based on

9   law --

10          THE COURT:  I have been doing this a while now.

11   If anybody feels strongly about that, I do.  I think most

12   judges, we are very protective of our jurors in this regard.

13   I give them great credit for being able to follow my

14   instructions.  And they do follow my instructions.

15          They are generally very bright and able to -- in

16   the main, they get it right.  But we have got to make sure

17   that we give them a correct basis upon which to act.  And I

18   am concerned and afraid in this case that there has -- and I

19   believe, quite frankly, it was inadvertent, that the

20   government has inadvertently tainted that ability through

21   the testimony of this witness to enable this jury to do

22   that.

23          So I am going to act out of an abundance of

24   caution and grant the motion in this case for a mistrial.

25          I will leave it to counsel to -- the government

1  has some decisions to make as to how it wants to proceed, a

2  decision to make as to how it wants to proceed.  And the

3  defense will have to figure out how it wants to respond to

4  that decision.

5           MS. WOLF:  Is that a mistrial without prejudice?

6           THE COURT:  That is a mistrial without

7  prejudice.  I would offer to the parties the opportunity to

8  brief the whole issue of whether a retrial should be

9  permitted.  I would imagine, the high quality of the

10  lawyering that's been done by both sides, I should expect

11  that I am going to be, should expect to be getting a motion

12  of some sort seeking to preclude a trial.  But I would ask

13  that once you communicate with one another, that you then

14  see if you can agree on a briefing schedule, submit that

15  schedule to the Court for my approval.  And I will make a

16  decision.  Okay?

17           MS. WOLF:  Thank you, Your Honor.

18           THE COURT:  Mistrial is granted.

19           MR. RATASIEWICZ:  Thank you, Your Honor.

20           THE COURT:  We are in recess.  And I will

21  dismiss the jury on my own.

22           (Court recessed at 1:55 p.m.)

23                    -  -  -

24  Reporter:  Kevin Maurer

25